Roderick G. Dorman (SBN 96908)
rdorman@mckoolsmith.com
MCKOOL SMITH P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200

Douglas A. Cawley (TX SBN 04035500) (Pro Hac Vice)
dcawley@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000

Joshua W. Budwin (TX SBN 24050347) (Pro Hac Vice)
jbudwin@mckoolsmith.com
John B. Campbell (TX SBN 24036314) (Pro Hac Vice)
jcampbell@mckoolsmith.com
Kristina S. Baehr (TX SBN 24080780 (Pro Hac Vice)
kbaehr@mckoolsmith.com
R. Mitch Verboncoeur (TX SBN 24105732) (Pro Hac Vice)
mverboncoeur@mckoolsmith.com
MCKOOL SMITH P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700

Attorneys for Plaintiff
ROVI GUIDES, INC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| ROVI GUIDES, INC., | ) | Case No. 2:19-cv-0275-AG (FFMx) |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Judge: Andrew J. Guilford |
| COMCAST CORPORATION; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC; COMCAST BUSINESS COMMUNICATIONS, LLC; COMCAST HOLDINGS CORPORATION; COMCAST SHARED SERVICES, LLC; COMCAST OF SANTA MARIA, LLC; and COMCAST OF LOMPOC, LLC, | ) ) ) ) ) ) ) ) ) | **AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | ) ) ) | |

McKool Smith, P.C.

Plaintiff Rovi Guides, Inc. brings this Complaint for patent infringement against Comcast Corporation; Comcast Cable Communications, LLC; Comcast Cable Communications Management, LLC; Comcast Business Communications, LLC; Comcast Holdings Corporation; Comcast Shared Services, LLC; Comcast of Santa Maria, LLC; Comcast of Lompoc, LLC (all Comcast entities, collectively, Comcast or Defendants) for infringement of U.S. Patent Nos. 9,055,319 (the '319 Patent); 8,448,215 (the '215 Patent); 8,973,069 (the '069 Patent); 7,873,978 (the '978 Patent); 9,232,254 (the '254 Patent); 8,272,019 (the '019 Patent); 7,735,107 (the '107 Patent); and 9,118,948 (the '948 Patent) (collectively, Asserted Patents). Plaintiff, on personal knowledge as to its own acts, and upon information and belief as to all others based on investigation, alleges as follows:

## SUMMARY OF THE ACTION

1.     For over a decade, Comcast has built its interactive cable video business on the back of Rovi's patented technology. Like every other major US Pay-TV provider in the United States, Comcast licensed Rovi's patented technology for a fixed term. But unlike every one of its Pay-TV competitors, Comcast refuses to renew its patent license on acceptable terms. Although Comcast's patent license expired, it continues to make, use, sell, offer for sale, import, lease, offer to lease, and distribute products that not only practice Rovi's patented innovations, but also compete with Rovi's own products. This action seeks relief for some of Comcast's unauthorized, infringing, and competitive conduct.

2.     Fourteen years ago, when Rovi's US patent portfolio was less than half the size it is today, Comcast paid Rovi over $250 million for a fixed-term license to Rovi's patent portfolio (License). The License also included important, non-monetary terms.

1

3.    Under the License, Comcast could use Rovi's patents in connection with Comcast's and its affiliates' Pay-TV systems. But the License expired on March 31, 2016, and since then, Comcast has not only failed to remove its infringing products and services from the market, it continues to provide and actively promote those infringing products and services to millions of its subscribers.

4.    As part of the parties' negotiations to renew Comcast's License, Rovi provided Comcast notice of infringement of many of the Asserted Patents. Rovi also explained that without renewing its License, Comcast would no longer have permission to use Rovi's patented innovations. Instead of taking a license, Comcast decided to willfully infringe those Asserted Patents.

5.    After the License expired, Rovi brought suit against Comcast in district court and in enforcement actions at the International Trade Commission (ITC) for patent infringement, asserting a small number of patents in its portfolio not asserted here.

6.    In November 2017, the ITC issued orders in the first ITC Investigation in favor of Rovi barring Comcast from importing and distributing Comcast's infringing set-top boxes (STBs) in the United States. *See generally In re Certain Digital Video Receivers & Hardware & Software Components Thereof*, Inv. No. 337-TA-1001, Comm'n Op. (Dec. 6, 2017) (Final Public Version). And in response, Comcast disabled valuable features that infringed the patents asserted in that ITC action, drawing complaints from Comcast's subscribers.

7.    And yet still, notwithstanding the ITC's orders and pending litigation, Comcast continues to refuse to renew its license to Rovi's technology. Comcast's decision to continue to willfully infringe stands in stark contrast to its prior recognition of the need for a license from Rovi.

8.    Indeed, Comcast is the lone holdout. Virtually the entire US Pay-TV industry is licensed to Rovi's portfolio of IPG patents. And in 2015 and 2016, every

2

McKool Smith, P.C.

McKool Smith, P.C.

major Pay-TV provider in the United States–*except Comcast*–renewed its license on economic terms that are generally consistent with those that Rovi has offered to Comcast, including AT&T, Charter, DISH, and Verizon. This is a clear testament to the value the industry places on Rovi's patent portfolio. So, while every one of its competitors pays a fair price for Rovi's innovative technology, Comcast alone uses it for free. Rovi is forced, then, to bring this additional infringement suit asserting additional patents in order to enforce its patent rights.

9.      Rovi's patent portfolio spans a broad range of interactive program guide and related video technologies, and Rovi presented many aspects of its portfolio to Comcast. During Rovi's negotiations with Comcast about renewing Comcast's license, Rovi provided exemplary patents from a variety of areas of Rovi's portfolio, including Guidance, Search & Recommendations, local DVR (digital video recorder), remote DVR, VOD (video-on-demand), Second Screen, and Interactive TV.  In order to streamline this action, the Asserted Patents in this Complaint relate to just one portion of Rovi's portfolio: advanced DVR functionalities such as cloud or network recording and whole-home or multi-room DVR arrangements that were developed by a Rovi company, United Video.

10.    The Asserted Patents cover fundamental DVR technologies at the core of the Comcast X1 system. Rovi's patented technology is therefore immensely valuable to Comcast and its customers. Nevertheless, Comcast has been using the technology claimed in these patents without a license—for free—since April 2016. While some of the Asserted Patents will expire before or shortly after trial, Rovi is nonetheless entitled to recover the value that Comcast has refused to pay for the fundamental DVR technologies covered by the Asserted Patents since Comcast's license expired. Rovi brings this action to seek its due compensation, and to deter Comcast's continued disregard for Rovi's intellectual property.

# THE PARTIES

## I.    ROVI: A PIONEER IN MEDIA TECHNOLOGY

11.    Plaintiff Rovi Guides, Inc. is a Delaware corporation, with a principal place of business at 2160 Gold Street, San Jose, California, 95002. Rovi Guides is a wholly-owned subsidiary of Rovi Corporation and is the owner of the Asserted Patents.

12.    Rovi is a global leader in digital entertainment technology solutions. Rovi's market-leading digital entertainment solutions enable the proliferation of access to media on electronic devices; these solutions include products and services related to Interactive Program Guides (IPGs) and other content delivery solutions, content discovery solutions, personalized search and recommendation, advertising and programming promotion optimization, and other data and analytics solutions to monetize interactions across multiple entertainment platforms. Rovi's solutions are used by companies worldwide in applications such as cable, satellite, and internet protocol television (IPTV) receivers, including digital television set-top boxes (STBs) and DVRs; PCs, mobile, and tablet devices; and other means by which consumers connect to entertainment.

13.    Rovi companies are and have been pioneers in media technology, including the technology facilitating consumer access to and discovery of television and other audiovisual media. Since introducing one of the first on-screen electronic program guides in 1981, Rovi has continued to innovate, developing products, services, and other solutions that connect consumers with their entertainment.

14.    Thanks largely to those innovations, Rovi has a portfolio of over 1,200 issued U.S. patents, including the Asserted Patents, and over 500 pending U.S. patent applications, more than 400 of which were filed after Comcast's license expired. Rovi's patent portfolio has grown through strategic acquisitions of groundbreaking companies, such as Veveo, and of patent portfolios from world-class innovators, such

4

as Microsoft. Rovi's patented inventions are used daily by consumers of media content, and are "must-haves" for television, other media service providers, and the consumer electronics industry that supports them.

15.     In recognition of the importance and value of Rovi's patented technologies and Rovi's role as an innovator, every major U.S. Pay-TV provider, including Comcast until its license agreement expired in 2016, has taken a license to a portfolio of Rovi's patents.

16.     In further recognition of the importance of Rovi's innovations, hundreds of small to mid-size cable operators in the United States use Rovi's i-Guide and Passport IPG solutions today to provide television discovery and navigation features to millions of their subscribers.

17.     Today, Rovi engineers continue to innovate to bring Rovi to the forefront of the next generation of IPG technology. In April 2018, Rovi released its Next-Gen Platform, an IPG solution based on internet-protocol (IP) that allows operators and consumers access to the most advanced television-viewing and navigation features.

## II.     DEFENDANTS

18.     Upon information and belief, Comcast Corporation is a Pennsylvania corporation, with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania, 19103. Through its wholly-owned subsidiaries, Comcast Corporation provides "Comcast" branded services, including Xfinity digital video, audio, and other content services to customers. Subscribers to Comcast's Xfinity television services receive a receiver, such as a set-top box. Upon information and belief, Comcast Corporation develops the infringing Xfinity services and equipment and provides the infringing receivers to customers.

19.     Upon information and belief, Comcast Cable Communications, LLC is a Delaware limited liability company, with a principal place of business at One

McKool Smith, P.C.

Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania, 19103.
Upon information and belief, Comcast Cable Communications, LLC is a subsidiary
of Comcast Corporation. Upon information and belief, Comcast Cable
Communications, LLC, jointly with the other Defendants, develops the infringing
Xfinity services and equipment and provides infringing receivers to customers.

20.    Upon information and belief, Comcast Cable Communications
Management, LLC is a Delaware limited liability company, with a principal place of
business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia,
Pennsylvania, 19103. Upon information and belief, Comcast Cable Communications
Management, LLC is a subsidiary of Comcast Corporation. Upon information and
belief, Comcast Cable Communications Management, LLC, jointly with the other
Defendants, develops the infringing Xfinity services and equipment and provides
infringing receivers to customers.

21.    Upon information and belief, Comcast Business Communications, LLC
is a Pennsylvania limited liability company, with a principal place of business at One
Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania, 19103.
Upon information and belief, Comcast Business Communications, LLC is a
subsidiary of Comcast Corporation. Upon information and belief, Comcast Business
Communications, LLC, jointly with the other Defendants, develops the infringing
Xfinity services and equipment and provides infringing receivers to customers.

22.    Upon information and belief, Comcast Holdings Corporation is a
Pennsylvania corporation, with a principal place of business at One Comcast Center,
1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania, 19103. Upon information
and belief, Comcast Holdings Corporation is a subsidiary of Comcast Corporation.
Upon information and belief, Comcast Holdings Corporation, jointly with the other
Defendants, develops the infringing Xfinity services and equipment and provides
infringing receivers to customers.

6

23.     Upon information and belief, Comcast Shared Services, LLC is a Delaware corporation, with a principal place of business at 330 N. Wabash Ave. 22, Chicago, IL, 60611-3586. Upon information and belief, Comcast Shared Services, LLC is a subsidiary of Comcast Corporation. Upon information and belief, Comcast Shared Services, LLC, jointly with the other Defendants, develops the infringing Xfinity services and equipment and provides infringing receivers to customers.

24.     Upon information and belief, Comcast of Santa Maria, LLC is a Delaware corporation, with a principal place of business at 685 East Betteravia Rd., Santa Maria, CA 93454. Upon information and belief, Comcast of Santa Maria, LLC is a subsidiary of Comcast Corporation. Upon information and belief, Comcast of Santa Maria, LLC, jointly with the other Defendants, develops the infringing Xfinity services and equipment and provides infringing receivers to customers.

25.     Upon information and belief, Comcast of Lompoc, LLC is a Delaware corporation, with a principal place of business at 1145 North H Street, Suite B, Lompoc, CA 93436. Upon information and belief, Comcast of Lompoc, LLC is a subsidiary of Comcast Corporation. Upon information and belief, Comcast of Lompoc, LLC, jointly with the other Defendants, develops the infringing Xfinity services and equipment and provides infringing receivers to customers.

## JURISDICTION AND VENUE

26.     This is an action arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (action arising under an Act of Congress relating to patents). Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

27.     More specifically, this action for patent infringement involves Comcast's manufacture, use, sale and/or lease, offer for sale and/or lease, and/or importation

7

into the United States of its infringing IPG system, including STBs (and their peripheral devices, such as remote control units), having hardware and software components, including, in particular, IPG software, alone or in conjunction with Comcast servers and/or mobile applications (the Accused Products) that are used in and with Comcast's Xfinity cable services.

28. The Accused Products include Comcast digital video receivers and related hardware and software, including at least the associated IPG software. Such Accused Products include X1 DVR and non-DVR set-top boxes,[1] Xfinity Stream and TV Remote mobile applications,[2] the Xfinity Stream Portal,[3] and the servers that operate in conjunction with the X1 receivers and Xfinity Stream App and Portal to create the Comcast Xfinity X1 System.

29. Upon information and belief, Comcast operates at least two Xfinity stores physically located in the Central District of California. Upon information and belief, Comcast conducts its regular, established business at these locations. These Xfinity stores provide infringing products to customers in this District. Comcast lists these Xfinity stores on its website and identifies them as places where customers can obtain infringing products.[4] Upon information and belief, Comcast owns and/or leases the premises where these Xfinity stores are located. Upon information and belief, these

---

[1] *See X1 TV Box Comparison – DVR vs. Non-DVR*, XFINITY, https://www.xfinity.com/support/articles/x1-hub-vs-companion-box (last visited Oct. 31, 2018).

[2] *See Set up the XFINITY TV Remote App*, XFINITY, https://www.xfinity.com/support/xfinity-apps/setting-up-the-cable-tv-app/ (last visited Oct. 31, 2018); *Get Access to Xfinity Stream*, XFINITY, https://www.xfinity.com/get-stream (last visited Oct. 31, 2018).

[3] *See View Programs from Your Xfinity Stream Portal*, XFINITY, https://www.xfinity.com/support/articles/xfinity-tv-website-on-screen-guide (last visited Oct. 31, 2018).

[4] *See, e.g.*, *685 East Betteravia Rd*, COMCAST, https://www.xfinity.com/local/ca/santa-maria/685-east-betteravia-rd.html (last visited Dec. 17, 2018).

MCKOOL SMITH, P.C.

Xfinity stores are staffed by persons directly employed by Comcast, many of whom live in this District.

30.    This Court has general and/or specific personal jurisdiction over Comcast Corporation, and venue is proper, in part because Comcast Corporation, directly and/or in combination with its subsidiaries and/or through its agents, does continuous and systematic business in this district, including by providing infringing products and services to residents of the Central District of California, by providing infringing products and services that it knew would be used within this district, and/or by participating in the solicitation of business from residents of this district.

31.    In addition, upon information and belief, Comcast Corporation, directly or through its subsidiaries, places infringing products in the stream of commerce, which is directed at this district, with the knowledge and/or understanding that such products will be sold, leased, or otherwise provided to customers within this district. In addition, upon information and belief, Comcast Corporation, directly or through its subsidiaries, employs individuals within the Central District of California, including employees who provide infringing products and services to customers here, and maintains offices and facilities here. Comcast Corporation, directly or through its subsidiaries, operates highly commercial websites through which regular sales and/or leases of products and/or sales of services are made to customers in this district, including products and services that, upon information and belief, infringe the Asserted Patents.

32.    This Court has general and/or specific personal jurisdiction over Comcast Cable Communications, LLC, and venue is proper, in part because Comcast Cable Communications, LLC, directly and/or in combination with other Comcast entities and/or through its agents, does continuous and systematic business in this district including by providing infringing products and services to residents of the Central District of California, by providing infringing products and services that it knew

McKool Smith, P.C.

would be used within this district, and/or by participating in the solicitation of business from residents of this district. In addition, upon information and belief, Comcast Cable Communications, LLC, directly or through its subsidiaries, places infringing products in the stream of commerce, which is directed at this district, with the knowledge and/or understanding that such products will be sold, leased, or otherwise provided to customers within this district. In addition, upon information and belief, Comcast Cable Communications, LLC, directly or through its subsidiaries, employs individuals within the Central District of California, including employees who provide infringing products and services to customers here, and maintains offices and facilities here. Comcast Cable Communications, LLC, directly or through its subsidiaries, operates highly commercial websites through which regular sales and/or leases of products and/or sales of services are made to customers in this district, including products and services that, upon information and belief, infringe the Asserted Patents.

33.    This Court has general and/or specific personal jurisdiction over Comcast Cable Communications Management, LLC, and venue is proper, in part because Comcast Cable Communications Management, LLC, directly and/or in combination with other Comcast entities and/or through its agents, does continuous and systematic business in this district including by providing infringing products and services to residents of the Central District of California, by providing infringing products and services that it knew would be used in this district, and/or by participating in the solicitation of business from residents of this district. In addition, upon information and belief, Comcast Cable Communications Management, LLC, directly or through its subsidiaries, places infringing products in the stream of commerce, which is directed at this district, with the knowledge and/or understanding that such products will be sold, leased, or otherwise provided to customers within this district. In addition, upon information and belief, Comcast Cable Communications Management,

McKool Smith, P.C.

McKool Smith, P.C.

1   LLC, directly or through its subsidiaries, employs individuals within the Central

2   District of California, including employees who provide infringing products and

3   services to customers here, and maintains offices and facilities here. Comcast Cable

4   Communications Management, LLC, directly or through its subsidiaries, operates

5   highly commercial websites through which regular sales and/or leases of products

6   and/or sales of services are made to customers in this district, including products and

7   services that, upon information and belief, infringe the Asserted Patents.

8          34.    This Court has general and/or specific personal jurisdiction over Comcast

9   of Santa Maria, LLC and venue is proper, in part, because Comcast of Santa Maria,

10   LLC, directly and/or in combination with other Comcast entities and/or through its

11   agents, does continuous and systematic business in this district including by

12   providing infringing products and services to residents of the Central District of

13   California, by providing infringing products and services that it knew would be used

14   within this district, and/or by participating in the solicitation of business from

15   residents of this district. In addition, upon information and belief, Comcast of Santa

16   Maria, LLC, directly or through its subsidiaries, places infringing products within the

17   stream of commerce, which is directed at this district, with the knowledge and/or

18   understanding that such products will be sold, leased, or otherwise provided to

19   customers within this district. In addition, upon information and belief, Comcast of

20   Santa Maria, LLC, directly or through its subsidiaries, has a regular and established

21   business within the Central District of California, at least at the Comcast store and

22   service center at 685 East Betteravia Rd., Santa Maria, CA 93454. In addition, upon

23   information and belief, Comcast of Santa Maria, LLC, directly or through its

24   subsidiaries, employs individuals within the Central District of California, including

25   employees who provide infringing products and services to customers here, and

26   maintains offices and facilities here. Comcast of Santa Maria, LLC, directly or

27   through its subsidiaries, operates highly commercial websites through which regular

28

11

sales and/or leases of products and/or sales of services are made to customers in this district, including products and services that, upon information and belief, infringe the Asserted Patents.

35.     This Court has general and/or specific personal jurisdiction over Comcast of Lompoc, LLC, and venue is proper, in part because Comcast of Lompoc, LLC, directly and/or in combination with other Comcast entities and/or through its agents, does continuous and systematic business in this district including by providing infringing products and services to residents of the Central District of California, by providing infringing products and services that it knew would be used in this district, and/or by participating in the solicitation of business from residents of this district. In addition, upon information and belief, Comcast of Lompoc, LLC, directly or through its subsidiaries, places infringing products in the stream of commerce, which is directed at this district, with the knowledge and/or understanding that such products will be sold, leased, or otherwise provided to customers in this district. In addition, upon information and belief, Comcast of Lompoc, LLC, directly or through its subsidiaries, has a regular and established business within the Central District of California, at least at the Comcast store and service center at 1145 North H Street, Suite B, Lompoc, CA 93436. In addition, upon information and belief, Comcast of Lompoc, LLC, directly or through its subsidiaries, employs individuals in the Central District of California, including employees who provide infringing products and services to customers here, and maintains offices and facilities here. Comcast of Lompoc, LLC, directly or through its subsidiaries, operates highly commercial websites through which regular sales and/or leases of products and/or sales of services are made to customers in this district, including products and services that, upon information and belief, infringe the Asserted Patents.

36.     This Court has general and/or specific personal jurisdiction over the remaining Defendants, and venue is proper, in part because said Defendants, directly

McKool Smith, P.C.

and/or in combination with Comcast Corporation and/or other Comcast Corporation subsidiaries, and/or through their agents, do continuous and systematic business in this district including by providing infringing products and services to residents of the Central District of California, by providing infringing products and services that it knew would be used within this district, and/or by participating in the solicitation of business from residents of this district.

37.    Venue is appropriate in this Court because the Plaintiff maintains its business in this District. One of Rovi's primary offices is situated at 2233 N. Ontario St., Burbank, CA 91504 and employs approximately 85 employees, including witnesses expected to testify in this action.

## FACTUAL BACKGROUND

## I.    ROVI'S HISTORY OF INNOVATION AND COMMERCIAL SUCCESS

38.    Rovi has invested in developing the substantial majority of the pioneering advances in IPG technology and related functionality for subscription-based television (aka Pay-TV) broadcasting.

39.    Since the launch of TV Guide Magazine in 1953, the Rovi family of companies (which has included, through strategic mergers, joint ventures, and acquisitions, United Video, TV Guide Onscreen, StarSight Telecast, Prevue, TV Guide, Video Guide, Gemstar, Aptiv Digital, Macrovision, Veveo, and FanTV) has been a pioneer and recognized leader in media technology, including the technology used to facilitate consumer access to television and other audiovisual media. Today, Rovi's market-leading digital entertainment solutions enable the proliferation of access to media on electronic devices; these solutions include products and services related to IPGs and other content discovery solutions, personalized search and recommendation, advertising and programming promotion optimization, and other data and analytics solutions to monetize interactions across multiple entertainment

McKool Smith, P.C.

13

McKool Smith, P.C.

1  platforms. Rovi's solutions are used by companies worldwide in applications such as

2  cable, satellite, and internet protocol television (IPTV) receivers (including digital

3  television STBs and digital video recorders (DVRs)); PCs, mobile, and tablet

4  devices; and other means by which consumers connect to entertainment.

5      40.   United Video was founded in Tulsa, OK, in 1965. United Video was a

6  visionary in broadcasting and entertainment throughout its history. United Video

7  offered the first electronic program guide in North America in 1981, almost 30 years

8  after the launch of TV Guide Magazine. This electronic program guide automatically

9  scrolled through program listings and did not provide any interactive program

10  features. Interactive program guides, which allow viewers to interact with program

11  listings, only became available later. Thus, before the 1990s and before United

12  Video's innovations during that time period, television viewers could only access

13  program listings with printed guides or automatically scrolling electronic guides.

14      41.   In the 1990s, United Video's innovations established itself as a pioneer in

15  digital broadcasting and interactive program guide technology, such as advanced

16  DVR features. United Video's forward-looking advanced DVR technologies—

17  including functionalities such as remote server recording and multi-client IPG

18  systems that relate to the Asserted Patents—remain important features for the cable

19  industry even today.

20      42.   In the late 1980s, another Rovi company invented the VCR Plus®, which

21  significantly simplified programming of videocassette recorders, enabling television

22  subscribers to more easily record the content they desired. VCR Plus® was a

23  resounding success and helped establish the Rovi family of companies as the

24  frontrunner in the program guide industry by broadly licensing its VCR Plus®

25  product and related technologies.

26      43.   In the mid-1990's, another Rovi company launched the first IPG services

27  designed for use in Pay-TV television receivers. These early IPGs were full-screen

28

McKool Smith, P.C.

grid guides that displayed television program listings by time and channel in a two-dimensional grid. Using a remote control, a user could interact with the guides to see, for example, what was on television at a later time or on a different channel, instead of depending on the automated scrolling of a traditional on-screen guide

44.   Rovi's IPG technologies today allow for multi-screen entertainment across a variety of user devices (e.g., seamless access to the same media from multiple devices and device types, like a television and mobile device), and provide customizable listings for televisions, receivers, game consoles, and mobile devices, thereby allowing consumers to find, discover, and enjoy the content they want, when they want it, and where they want to access it. These and other innovations help users navigate an increasingly overwhelming amount of content to discover and access entertainment they actually want to watch on virtually any platform or device.

45.   To maintain Rovi's leadership position in this industry, Rovi has invested and continues to invest significant resources in the design, development and licensing of its IPGs and related technologies used by television service providers (as well as others in the digital entertainment industry). For example, from 2014 to 2017, Rovi invested over $300 million in research and development. Furthermore, Rovi has over 700 U.S.-based, full-time employees supporting the development of new products and platforms.

46.   Rovi has incorporated its technological innovations resulting from its significant investment in research and development into its commercial products. For example, Rovi's i-Guide and Passport Guide are IPGs that provide comprehensive listings, intuitive search capabilities, advanced DVR and Video-on-Demand functionality, and HD support. Hundreds of small to mid-size cable operators, serving millions of subscribers in the United States, use Rovi's i-Guide and Passport Guide IPG solutions today.

47.    In addition, Rovi invests heavily in next-generation IPTV solutions. These investments have led to groundbreaking products like the Next-Gen Platform IPG solution, which was announced to the public in January 2018 and released to the public in April 2018. The Next-Gen Platform IPG solution serves an expanding base of retail TiVo Bolt/VOX hardware users and cable operator-customers with industry-leading IPTV features.

48.    The value of Rovi's innovative solutions has been recognized by numerous leading Pay-TV service providers, which license these technologies and solutions from Rovi.  Today, almost 150 million households worldwide access Pay-TV entertainment through Rovi's technology.

49.    In addition, Rovi's innovative IPG related technologies have been recognized through numerous industry awards and accolades. For example, in 2012 Rovi was awarded a Technology and Engineering Emmy® Award for its "Pioneering On-Screen Interactive Program Guides" that assist "viewer[s] in rapidly locating their desired program." These Emmy® awards are designed to recognize "developments . . . involved in engineering technologies which either represent so extensive an improvement on existing methods or are so innovative in nature that they materially have affected the transmission, recording, or reception of television."[5]

50.    Rovi's history of innovation is also reflected in the extensive patent coverage awarded to Rovi for its inventions. This portfolio, which includes more than 4,500 issued or pending patents worldwide, is a direct result of Rovi's substantial and ongoing investment in research and development. The Asserted Patents are reflective of this history of innovation, embodying a number of firsts in the development of IPG and advanced DVR related technologies.

---

[5]    *Technology & Engineering*, THE NATIONAL ACADEMY OF TELEVISION ARTS & SCIENCES, http://emmyonline.com/tech (last visited Dec. 17, 2018).

McKool Smith, P.C.

51.    The strength of Rovi's patent portfolio has been recognized by the entertainment industry. Every major U.S. Pay-TV provider, including AT&T (which recently acquired DirecTV), Charter, Dish, and Verizon among others, has acknowledged the value of Rovi's innovations by licensing Rovi's patents covering these innovations—and renewing those licenses in the last few years. Comcast itself once licensed Rovi's portfolio for over $250 million for a fixed term (March 2004 – March 2016). Many leading video content providers, including both traditional media (cable, satellite, IPTV) and new media (online, mobile), as well as manufacturers and distributors of receivers and other consumer electronic devices, have also licensed Rovi's patent portfolio. Yet, despite this widespread recognition of the value and importance of Rovi's patent portfolio, Comcast decided to free ride, refusing to renew its license and compensate Rovi.

52.    Rovi's long-term financial success depends, in part, on its ability to establish, maintain, and protect its proprietary technology through patents. Comcast's infringement presents significant and ongoing harm to Rovi's business.

## II.    COMCAST HAS LONG BENEFITED FROM ITS USE OF ROVI'S PATENTED TECHNOLOGIES

53.    Before Comcast first licensed Rovi's patents, it measured business success with reference to how many subscribers it had. Comcast did not historically measure its business success by the quality of the services it provided to its customers. Comcast touted itself in its 2002 10-K as being the "largest cable operator in the United States."

54.    Nonetheless, beginning in or around 2004, Comcast began attributing revenue growth to its "advanced services" including Video-on-Demand (VOD) and digital-video-recording (DVR). Comcast recognized that its future business success depended on product differentiation from other cable operators and satellite

17

McKool Smith, P.C.

providers—product differentiation provided by offering advanced services to its customers.

55.    In 2004, to secure the growth in its "advanced services," Comcast entered into a license agreement with Gemstar (a forerunner to Rovi) (2004 Agreement) which Comcast described in SEC filings as an effort "to acquire and develop technology that will drive product differentiation and new applications and extend our nationwide fiber-optic network"[6] and enhance Comcast's IPG platform to improve Comcast's ability to challenge its competitors. Importantly, the 2004 Agreement was not a sale of technology from Gemstar to Comcast by which Comcast "acquired" the technology from Gemstar; it was a license for a fixed term during which Comcast had permission from Gemstar to use that technology for specific purposes, but only until the license expired. The 2004 Agreement included a Joint Venture with Gemstar called GuideWorks, under which Gemstar would help Comcast develop a next generation IPG platform, as well as a license to Gemstar's guidance patent portfolio.

56.    Comcast's use of Rovi's (then Gemstar's) technology to develop and enhance IPGs to be offered by Comcast is evidenced, among other ways, by Comcast's description of the 2004 Agreement in the Comcast 2006 10-K SEC filing. Comcast stated, "This [2004 Agreement] allows us to utilize Gemstar's intellectual property and technology and the TV Guide brand and content on our interactive program guides. . . . In addition, we and Gemstar formed an entity to develop and enhance interactive programming guides."[7]

---

[6]    *See* Comcast Annual Report 2004 at 18, available at http://www.annualreports.com/HostedData/AnnualReportArchive/c/NASDAQ_CMCSA_2004.pdf.

[7]    *Id.* at 48.

McKool Smith, P.C.

57.    In order to further secure improved products and services, in 2004, "Comcast sign[ed] strategic agreements with Gemstar-TV Guide and Microsoft to develop enhancements to the user interface and the functionality of its service offerings."[8]

58.    Comcast's 10-K SEC filings from 2004 to date consistently evidence Comcast's recognition of the importance of the technology needed to provide advanced services in connection with its digital cable services, including advanced VOD and DVR features. In fact, in its 2004 10-K, Comcast noted that its "subscriber growth is attributable to new and improved products and advanced services in our digital cable and high-speed Internet services."[9] Each filing thereafter provides additional evidence that Comcast recognized the importance of its advanced services. Increased competition from telecommunications providers, ISPs, and satellite companies in the provision and delivery of new and advanced services was, and since 2004 has been, one of Comcast's greatest competitive concerns.

59.    Rovi is informed and believes that the technology Rovi made available to Comcast during the term of the 2004 Agreement was foundational to Comcast's ability from 2004 to the present to offer new and advanced services, to grow its business, and to develop its own IPG and advanced service platforms, and throughout that period Comcast personnel were aware of these facts.

60.    In 2010, Comcast and Rovi terminated their joint venture, while at the same time Comcast reaffirmed its need for Rovi technology by entering into an expanded patent license agreement with Rovi. Indeed, Rick Rioboli, SVP, Comcast

---

[8]    *See Comcast Timeline*, COMCAST, http://corporate.comcast.com/news-information/timeline (last visited Dec. 17, 2018).

[9]    *See* Comcast Annual Report 2004 at 18.

McKool Smith, P.C.

Metadata Products and Search Services, remarked that "Rovi has been a very important partner of ours for many years."[10]

61.    In 2012, while under license to Rovi's patents, Comcast launched the X1 IPG Product, which it describes as "a cloud-enabled video platform that transformed the TV into an interactive, integrated entertainment experience."[11]

62.    In 2014, also during the pendency of its then soon-to-expire License to Rovi's patents, Comcast introduced the next generation of its X1 IPG Product, which it describes as "designed to make navigation, search and discovery of content easier and quicker than ever before. The X1 IPG Product gives customers an interactive TV experience, providing instant access to all of their Entertainment."[12]

63.    As set forth herein, Comcast's X1 IPG Product is designed to and does infringe at least one claim of each of the Asserted Patents.

64.    Comcast has an installed base of several million X1 subscribers and is continuing to market throughout the United States to further expand the reach of its X1 IPG Product.[13]

65.    Even today, Comcast recognizes the critical role that its infringing IPG platform has in driving product differentiation and consumer demand for its products and services. For example, Comcast explained to the FCC that "the interface is how MVPDs [multichannel video program distributors] . . . differentiate themselves in a

---

[10]    *Rovi Corporation Sends Letter to Stockholders*, Tivo, http://pr.tivo.com/file/4206196/Index?KeyFile=29075378 (last visited Nov. 29, 2018).

[11]    *See Our Story*, Comcast, http://corporate.comcast.com/our-company/our-story, archived at https://web.archive.org/web/20170519044316/http://corporate.comcast.com/our-company/our-story.

[12]    *Id.*

[13]    *See* Comcast Annual Report 2017 at 3-4 (Comcast's cable distribution footprint), 40, available at https://www.cmcsa.com/static-files/111ba611-eb85-4edc-9000-3907c84697d8; CMCSA - Q4 2017 Comcast Corp Earnings Call at 7, available at https://www.cmcsa.com/static-files/80bfd80b-e421-43d8-b28b-1be5f1b871d8.

highly competitive marketplace."[14] Comcast further explained that, "[f]aced with fierce competition, providers are intent on giving consumers the flexibility they demand to access video programming on the devices of their choice, and delivering more value to customers."[15]

66.   On March 31, 2016, Comcast's license to use the Rovi technology expired. Comcast refused to execute a new license, yet continues to practice the inventions claimed in Rovi's patents, and continues to offer, lease, and distribute the X1 product and enhanced IPG platform that not only infringes Rovi's patents, but could not and would not ever have been lawfully developed but for the license of Rovi's technology granted to Comcast in the 2004 Agreement, which has now expired.

## III.   COMCAST AND ROVI ARE COMPETITORS IN THE DEVELOPMENT AND PROVISION OF IPG SOLUTIONS

67.   Comcast markets and provides its Accused Products, including the X1 IPG Product, in the United States to subscribers. Comcast explains to its subscribers and would-be subscribers that the Accused Products, including X1 set-top boxes, provide advanced DVR features covered by the asserted patents. For example, Comcast has branded these DVR features as "X1 AnyRoom DVR,"[16] "X1 Cloud DVR,"[17] and downloading and scheduling recordings on the "Xfinity Stream App"[18] and provides instructions for these features on its website and forums.

---

[14]   *See* Comments of Comcast Corporation and NBCUniversal Media, LLC, at 34 n.63 (April 22, 2016), available at http://corporate.comcast.com/images/2016-04-22-AS-FILED-Comcast-DSTAC-STB-NPRM-Comments.pdf.

[15]   *Id.* at 3.

[16]   *X1 AnyRoom DVR – What it is and How it Works*, XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Nov. 13, 2018).

[17]   *X1 Cloud DVR FAQs*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Nov. 13, 2018).

21

McKool Smith, P.C.

McKool Smith, P.C.

68.   Rovi invests in the development of innovative guide products, including Next-Gen, i-Guide, and Passport that compete directly and indirectly with Comcast's Accused Products in the United States. Rovi's next-generation IPTV products not only provide fundamental DVR functionalities covered by the Asserted Patents, such as "Multi-Room DVR," but also allow users to download recordings to portable devices, such as Smartphones and Tablets, using the TiVo App. And in the first half of 2019, Next-Gen will include network DVR (nDVR) functionality that provides viewers with remote server recording functionality. Rovi's i-Guide and Passport IPG solutions are used by hundreds of small to mid-size cable operators, serving millions of subscribers, to provide fundamental DVR functionalities covered by the Asserted Patents, such as "Multi-Room DVR."

69.   Comcast also markets and licenses its Accused Products, including the X1 IPG Product, in the United States to other Pay-TV providers in competition with Rovi as part of its X1 Syndication Platform.[19] As an example of this competition between Rovi and Comcast, Cequel III Programming, LLC d/b/a Suddenlink Communications (Suddenlink) has, for the past several years, licensed Rovi's i-Guide IPG platform, which Suddenlink has deployed to hundreds of thousands of subscribers. Comcast has marketed its X1 syndication product, including the DVR features covered by the Asserted Patents, to Suddenlink, in direct competition to Rovi.

70.   In addition, Comcast promoted its infringing products and services by announcing, on April 20, 2016, the launch of its Xfinity TV Partner Program, in order to encourage and enable television and consumer electronics companies to implement

---

[18]   *Get Access to Xfinity Stream*, XFINITY, https://www.xfinity.com/get-stream (last visited Nov. 13, 2018).

[19]   *Transforming Your Customers' Experience*. COMCAST TECHNOLOGY SOLUTIONS, https://www.comcasttechnologysolutions.com/our-portfolio/x1-platform (last visited Dec. 10, 2018).

Comcast's Xfinity IPG app, which "will provide access to [Comcast's] TV cable service, . . . live and on demand programming and cloud DVR recordings, and will be available on partners' smart TVs, TV-connected devices, and other IP-enabled video devices."[20] Comcast continues to promote its Xfinity TV Partner Program today, advertising "an intuitive user interface, personalized content, and cloud DVR recordings."[21]

71.   Upon information and belief, Comcast will continue to market its X1 IPG Product to customers as well as to other Pay-TV providers (including Pay-TV providers that do not have a license to Rovi's patents)—in direct competition with Rovi's own patent-protected IPG products.

## IV.   COMCAST'S INFRINGING PRODUCTS AND SERVICES

72.   Upon information and belief, Comcast is in the business of providing digital video, audio, and other content services to customers under the name "Xfinity." Comcast provides its subscribers with at least one Accused Product that is necessary for the receipt of such services.

73.   Upon information and belief, Xfinity products and services are provided to consumers through the coordinated and combined participation of Comcast and/or under Comcast's instruction, direction, and/or control. Directly and/or indirectly, Comcast Corporation owns regional subsidiaries that provide telecommunications and video services to customers in a number of states. Xfinity services have been

---

[20]   Mark Hess, *Comcast Seeks TV and Other Consumer Electronics Partners to Bring Xfinity TV Cable Service to More Retail Devices*, COMCAST (Apr. 20, 2016), available at https://corporate.comcast.com/comcast-voices/comcast-seeks-partners-to-bring-xfinity-tv-cable-service-to-more-retail-devices; *see also* Jeff Baumgartner, *Comcast to Stream Its Pay TV Service to LG TVs*, MULTICHANNEL (Sept. 25, 2017), available at https://www.multichannel.com/news/comcast-stream-its-pay-tv-service-lg-tvs-415485.

[21]   *Xfinity TV Partner Program*, XFINITY, https://developer.comcast.com/site/tv_partner_program/index.gsp (last visited Dec. 11, 2018).

McKool Smith, P.C.

McKool Smith, P.C.

1   made available to consumers through at least the following regional subsidiaries

2   owned, directly or indirectly, by Comcast Corporation: Comcast of

3   Arkansas/Florida/Louisiana/Minnesota/Mississippi/Tennessee, Inc.; Comcast of

4   Boston, Inc.; Comcast of California II, LLC; Comcast of California III, Inc.; Comcast

5   of California IX, Inc.; Comcast of California/Colorado, LLC; Comcast of

6   California/Colorado/Florida/Oregon, Inc.; Comcast of

7   California/Colorado/Illinois/Indiana/Michigan, LP; Comcast of

8   California/Maryland/Pennsylvania/Virginia/West Virginia, LLC; Comcast of

9   California/Massachusetts/Michigan/Utah, LLC; Comcast of Colorado IX, LLC;

10  Comcast of Colorado/Florida/Michigan/New Mexico/Pennsylvania/Washington,

11  LLC; Comcast of Colorado/Pennsylvania/West Virginia, LLC; Comcast of

12  Connecticut, Inc.; Comcast of Connecticut/Georgia/Massachusetts/New

13  Hampshire/New York/North Carolina/Virginia/Vermont, LLC; Comcast of

14  Florida/Georgia/Illinois/Michigan, LLC; Comcast of Florida/Georgia/Pennsylvania,

15  L.P.; Comcast of Garden State, L.P.; Comcast of Houston, LLC; Comcast of Illinois

16  VI, Inc.; Comcast of Illinois/Indiana/Ohio, LLC; Comcast of Lompoc, LLC; Comcast

17  of Maine/New Hampshire, Inc.; Comcast of Maryland, LLC; Comcast Cable of

18  Maryland, LLC; Comcast of Massachusetts I, Inc.; Comcast of Massachusetts II, Inc.;

19  Comcast of Massachusetts III, Inc.; Comcast of Massachusetts/New Hampshire,

20  LLC; Comcast of New Jersey II, LLC; Comcast of Oregon II, Inc.; Comcast of

21  Philadelphia II, LLC; Comcast of Potomac, LLC; Comcast of Santa Maria, LLC;

22  Comcast of South Jersey, LLC; Comcast of Southeast Pennsylvania, LLC; Comcast

23  of the South; Comcast of Utah II, Inc.; and Mile Hi Cable Partners, LP (collectively,

24  regional subsidiaries).

25       74.   Upon information and belief, Comcast Corporation and its regional

26  subsidiaries hold themselves out as a single entity in providing the infringing Xfinity

27  products and services. Comcast's various Xfinity services are centrally advertised,

28

24

documented, and explained on the website, www.xfinity.com. Upon information and belief, the Comcast regional subsidiaries use identical contracts and other documents in the provision of the infringing Comcast Xfinity products and services that are generated and approved by Comcast Corporation and/or collectively by the aforementioned regional subsidiaries. For example, Comcast Xfinity TV services have the same "Residential Services Policies" for residential customers, regardless of their location.[22]

75.    Upon information and belief, acting through one or more of its officers and/or its board of directors, Comcast Corporation has: (a) approved and authorized the development by designated Comcast Corporation subsidiaries of the technology and infrastructure necessary to offer the Xfinity service to the consuming public; (b) approved and authorized the capital expenditures by its subsidiaries necessary to provide the Xfinity service to consumers; and/or (c) authorized and directed its regional subsidiaries to provide the Xfinity service under the Comcast brand to consumers in their operating areas. Comcast Corporation further directed and controlled the activities of its regional subsidiaries. In doing so, Comcast Corporation (together with the remaining Defendants) actively induced the infringement of such subsidiaries.

76.    Comcast markets the Xfinity service to subscribers of each of the regional subsidiaries described above and actively solicits their business through Comcast's website.

77.    Upon information and belief, Comcast has been involved in the design, testing, and implementation of the Xfinity service. Upon information and belief, Comcast provides overall management and coordination of the elements of the

---

[22]    *See Xfinity Terms of Service*, XFINITY, http://my.xfinity.com/terms/ (last visited Dec. 17, 2018).

25

McKool Smith, P.C.

network used to deliver Comcast's Xfinity services, and of the regional subsidiaries that own and operate those elements.

78.    In addition, Comcast has caused and directed at least the regional subsidiaries to engage in activities, including those activities described above, that have resulted in the infringement of one or more claims of the Asserted Patents. In performing the activities that, either individually or in combination, have infringed one or more claims of the Asserted Patents, the regional subsidiaries have acted as agents of at least Comcast Corporation, and their infringing activities have been within the course and scope of that agency.

79.    Upon information and belief, Comcast does not manufacture the set-top boxes that it provides to Xfinity customers, but it is closely "involved with the design, manufacture, and importation" of these Accused Products. *Certain Digital Video Receivers and Hardware and Software Components Thereof*, Inv. No. 337-TA-1001, Initial Determination, (June 27, 2017) (Final Public Version) at 12. Comcast's X1 set-top boxes are "so tailored" to Comcast's X1 system that "they would not function within another cable operator's system." *Id.* (citations omitted).

80.    Comcast set-top boxes contain, or are designed to receive and execute, software (including IPG software) enabling a Comcast subscriber to infringe the Asserted Patents. Upon information and belief, the receivers are specifically manufactured to be combined with such software for use in Comcast's service infrastructure. Comcast leases and/or otherwise provides to its subscribers these receivers along with user guides and manuals describing how to use the receivers and their associated features.

81.    In addition, Comcast provides mobile applications, such as the Xfinity Stream App, for controlling DVR and program guide functionality that are usable only by paying subscribers to Comcast's Xfinity services. Comcast enables

26

subscribers to download and store DVR recordings on their mobile devices using the Xfinity Stream App.

82.   Rovi is informed and believes that Comcast has engaged in activities that promote the use and distribution of the X1 IPG Product and the Xfinity services and thereby encourages the infringement of Rovi's patents. Those activities include, among others, its instructions for X1 subscribers on how to infringe Rovi's patents. For example, Comcast instructs its subscribers how to use X1 AnyRoom DVR to watch recorded shows on any X1 TV Box they have in the home.[23] As another example, Comcast informs its subscribers that they can, from Comcast's websites, "[l]earn how to download cloud-based DVR recordings and available Xfinity On Demand content to your Apple or Android device. We'll show you how to download and check in recordings and On Demand programs using the Apple version of the mobile app."[24]

83.   Rovi is informed and believes that, in or before 2012, Comcast was considering ways: (a) to promote the adoption of its X1 IPG platform, which extensively utilizes Rovi's patented technology, as an industry standard; (b) to have new applications and enhancements to its platform developed; and (c) to avoid the research and development cost of developing such new applications and enhancements.

84.   Upon information and belief, the solution to meet those three goals was for Comcast to develop a defined stack of software on one layer of an operating set-top box. Comcast made significant "effort[s] to get vendors such as original

---

[23]   *X1 AnyRoom DVR – What It Is and How It Works,* XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 10, 2018).

[24]   *Download Cloud-Based DVR Recordings and Xfinity On Demand Content to Your Device*, XFINITY, https://www.xfinity.com/support/articles/x1-xfinity-tv-app-download-a-program (last visited Oct. 10, 2018).

McKool Smith, P.C.

equipment manufacturers (OEMs), semiconductor manufacturers, software vendors, software integrators and multichannel video programming distributors to create an ecosystem for new gear for cloud-based and hybrid video serves like Comcast's X1 service."[25] Comcast is substantially involved in the design and manufacture of the receivers, including set-top boxes, onto which the infringing Comcast IPGs are loaded.

85.    Upon information and belief, Comcast obtains significant quantities of specially designed, unlicensed receivers, including set-top boxes, from third parties.

86.    Upon information and belief, over half of Comcast's 22 million subscribers are on the X1 platform.[26] Comcast has had and continues to have significant involvement in the importation and distribution of receivers. Comcast has held itself out as the "supplier" of its receivers, including its set-top boxes that it distributes to its subscribers. For example, in connection with the FCC filing made by Comcast relating to the potential merger of Comcast and Time Warner, Comcast repeatedly referred to "Comcast-supplied set-top boxes," and characterized set-top boxes used in connection with the X1 platform as "Comcast's."[27]

87.    Upon information and belief, these Comcast receivers contain, or are designed to receive and execute, software (including IPG software) enabling advanced DVR features such as: recording programs on one device and playing back

---

[25]    *News and Events*, *Pace licenses RDK set top design kit from Comcast*, RDK CENTRAL, http://rdkcentral.com/test/pace-licenses-rdk-set-top-design-kit-from-comcast/ (last visited Dec. 18, 2018); *see also* Deborah D. McAdams, *Motorola Mobility Licenses Comcast RDK*, TVTECHNOLOGY (Aug. 22, 2012), http://www.tvtechnology.com/news/0002/motorola-mobility-licenses-comcast-rdk/215089 (noting Comcast's attempts to license RDK).

[26]    David Hayes, *Comcast X1 Subscribers Can Get Epix In Early 2018 Under New Distribution Deal*, DEADLINE (Nov. 28, 2017, 9:33 AM), http://deadline.com/2017/11/comcast-x1-subscribers-get-epix-in-early-2018-under-new-distribution-deal-1202215657/.

[27]    *See generally In re Comcast Corp.*, MB Dkt. No. 14-57, Opp'n to Pets. to Deny & Resp. to Comments (Sept. 23, 2014), *available at* http://apps.fcc.gov/ecfs/document/view?id=7522909787.

those programs on another device; watching programs from a point prior to when the program was tuned to using a remote server; beginning watching a program on one device and resuming watching the program on another device or choosing an option to resume watching from a prior point; causing a program to be transferred from a first storage device to a second storage device and stored for later playback, and managing directories of remote server recordings. Comcast designs the infringing IPG software that is loaded onto such receivers (and for which purpose such receivers were designed).

88.    Upon information and belief, Xfinity products and services are provided to consumers through the coordinated and combined participation of Comcast and/or under Comcast's instruction, direction, and/or control.

## V.    COMCAST REFUSES TO RENEW ITS LICENSE—NOTWITHSTANDING LITIGATION AND FINDINGS OF INFRINGEMENT OF CERTAIN ROVI PATENTS

89.    On April 1, 2016, Rovi sued Comcast in two district court actions for infringing various patents not asserted here. One of those actions is stayed in the Southern District of New York (Case No. 1:16-cv-09826). The other action is partially stayed in the Southern District of New York while proceeding on certain claims. (Case No.1:16-cv-09278).

90.    On April 6, 2016, Rovi brought an enforcement action against Comcast in the International Trade Commission for importing products that infringe various patents—again, patents not asserted here. In November 2017, the Commission found that Comcast's X1 STBs infringed two of those patents, excluded future imports of these boxes, and ordered Comcast not to import or distribute infringing products. *See generally In re Certain Digital Video Receivers & Hardware & Software Components Thereof*, Inv. No. 337-TA-1001, Comm'n Op. (Dec. 6, 2017) (Final Public Version).

MCKOOL SMITH, P.C.

29

91.   On January 10, 2018, Rovi again sued Comcast in two district court actions for infringing various patents not asserted here. On February 8, 2018, Rovi brought an enforcement action against Comcast in the International Trade Commission for importing products that infringe these same patents (Inv. No. 337-TA-1103). The two district court actions are stayed in the Central District of California (Case No. 2:18-cv-00253) and the District of Massachusetts (Case No. 1:18-cv-10056) pending the resolution of the enforcement action in the International Trade Commission.

92.   And yet even after the ITC orders, and even despite the currently pending actions, Comcast refuses to renew its License to Rovi's portfolio. Comcast continues to make, use, sell, offer to sell, lease, offer to lease, import, and distribute products that infringe Rovi's patents, including the Asserted Patents in this Complaint. Comcast continues to violate Rovi's intellectual property rights with impunity and use Rovi's technology for free, while all of Comcast's competitors agree to pay a reasonable price for a license to Rovi's valuable patent portfolio.

## FIRST CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 9,055,319

93.   Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-92 of this Complaint.

94.   The '319 Patent is valid and enforceable under United States Patent Laws.

95.   Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '319 Patent, including the right to collect for past damages.

96.   A certified copy of the '319 Patent is attached as Exhibit A.

## __The '319 Patent__

97.    The '319 Patent describes, among other things, a system for playing back recorded programs on a different device than the device that recorded the program. The patent discloses that a first device (e.g., an STB) records a program in response to a user request. The first device later receives a request to playback the program from another device (e.g. a second STB) and transmits the program to the second device. The second device receives the transmitted program from the first device and generates the received program for display on a screen.

98.    As the '319 Patent describes, the user may initiate a record request for a program:

> When a user indicates a desire to record a program or program grouping on remote media server 24 or local media server 29 (and possibly a desire to confirm recording of the program), the program guide generates a record request that is transmitted to the appropriate remote media server by communications device 51 (FIG. 9) via communications path 20 or 31. The record request may include, for example, an identifier for the program that the user wishes to record, an identifier for the user, and, if desired, any other information related to the program and the user. If the user indicated a desire to record a program grouping, the request may include a grouping identifier or the program identifiers of the constituent programs.

'319 Patent at 22:12-24.

99.    In response, a media server may record the program, store any associated program guide data, and provide a directory:

> At the time a selected program or program in a grouping airs (which may be the time at which the program is selected for recording), remote media server 24 or local media server 29 may record the program and any associated program guide data. Program guide data may be stored as files associated with the program using pointers. Once the selected program is recorded, remote media server 24 or local media server 29 may provide a copy of user directory 59 to the program guide if the program guide maintains a copy of user directories. Alternatively, remote media server 24 or local media server 29 may provide a pointer to the location of the program on media store 63. In still another suitable approach, user directories 59 may be maintained solely by remote media server 24 or local media server 29 and

31

McKool Smith, P.C.

provided to the program guide on request.

'319 Patent at 22:12-39.

100. The user can access the directory of recorded programs in a number of ways and the system may use an overlay to display the directory:

> The program guide may provide the user with the opportunity to access a directory or other such list of programs that have been recorded for the user on remote media server 24 or local media server 29. The user may indicate a desire to access a directory or list of recorded programs by, for example, pressing a "DIR" key on remote control 40 or selecting a "Directory" feature from main menu 107. FIGS. 18 a and 18 b show illustrative overlays 320 that may be displayed by the program guide when the user indicates a desire to view a directory of the programs that the user has recorded on remote media server 24 or local media server 29. FIG. 18 a shows overlay 320 overlaid on top of the video of the channel that the viewer is watching. FIG. 18 b shows overlay 32 overlaid on top of a program listings screen. Overlay 320 may display any information related to the programming that the user has selected for recording by remote media server 24 or local media server 29. Overlay 320 may display, for example, the channels and titles of the recorded programs, the dates and times they are recorded, or any other suitable information.
>
> Program listings for recorded programs may be organized by channel, theme, user, or by any other suitable criteria. In practice, program listings for recorded programs may be displayed in overlays based on the type of display screen over which the overlays are displayed. In FIG. 18 b, for example, listings are displayed by time because the display screen over which they are displayed displays program listings by time. FIG. 18 c shows listings of recorded programs in the movies category, because the display screen over which they are displayed only displays listings for movies. FIGS. 18 b and 18 c are illustrative and any suitable criteria may be used. In addition, program listings may be displayed using display criteria or based on themes when the program listings are overlaid on top of a video the user is watching.

'319 Patent at 22:47-23:12.

101. The '319 Patent provides illustrative directory screens that may be displayed by the program guide:

> FIG. 18d shows an illustrative directory screen 350 that may be displayed by the program guide when the user indicates a desire to view a directory of the programs that the user has

32

McKool Smith, P.C.

1    recorded on remote media server 24 or local media server
2    29. Directory screen 350 may display program-related
     information like that displayed by overlay 320. Directory
3    screen 350 may also include other program guide display
     screen elements, such as selectable advertisements, service
4    provider logos, brand logos, advertisement banners, etc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



FIG. 18d

24   '319 Patent at 23:13-21, FIG. 18d.

25        102. Using the directory, the user can playback a recorded program on

26   demand:

27        The program guide may provide users with the opportunity
     to play programs on demand that users have previously

28

33

recorded on remote media server 24 or local media server 29. Remote media server 24 or local media server 29 may play programs on-demand in response to playback requests generated by the program guide. As used herein, "playback request" is intended to mean any command, request, message, remote procedure call, object based communication, or any other type of interprocess or inter-object based communication whereby the program guide may communicate information to a media server specifying which program the user wishes to play back. The program guide may generate playback requests when a user indicates a desire to view a program that has been recorded. The user may indicate a desire to view a program that has been recorded by, for example, highlighting a listing in a directory or list and pressing a "PLAY" key on remote control 40.

When the user indicates a desire to view a program that has been recorded, the program guide generates a playback request that is transmitted by communications device 51 to remote media server 24 or local media server 29 via communications path 20 or 31.

'319 Patent at 25:16-38.

## **Historical Context of the '319 Patent**

103.  Over the years, cable, satellite, and broadcast television providers have offered an increasingly large number of television channels and television program listings. Traditionally, users would consult printed television program schedules to determine the programs being broadcast at particular times. '319 Patent at 1:26-30. In the years leading up to the '319 Patent, interactive electronic television program guides allowed users to more easily navigate television program information. '319 Patent at 1:30-32. These IPGs frequently organized the various television program listings in a grid, wherein each row in the grid contains television program listings for a different channel, and each column in the grid corresponds to a determined broadcast time. '319 Patent at 1:32-37.

104.  Some systems allowed for programs selected with a set-top box (STB) to be recorded and stored on a videocassette recorder. While the use of a VCR provided

34

the benefits of basic recording, the functionality was very limited. '319 Patent at 1:49-62.

105.  Other systems that used hard disk technology to store programs were available, but these systems suffered from the need for multiple additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '319 Patent at 2:1-10.

106.  Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available or were limited to only a subset of programs that the operator decided to record. '319 Patent at 2:21-28.

107.  The inventors of the '319 Patent disclosed novel systems and methods that provided an interactive program guide system that allows users to decide to record certain programs on one device that later may be played back to the user on demand from another device. These novel systems and methods allow subscribers to choose the content to be recorded and expand the amount of content that can be available to subscribers on demand, while reducing costs through shared DVR storage.

### '319 Patent Allegations

108.  On information and belief after reasonable investigation, Comcast markets the infringing functionality as "AnyRoom DVR".[28] On information and belief and after reasonable investigation, Comcast provides the X1 system, which allows a user to playback a program recorded on another device using an IPG implemented on user equipment (the '319 Accused Products). Further, on information and belief and after reasonable investigation, Comcast performs the

---

[28]   *X1 AnyRoom DVR – What It Is and How It Works,* XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 15, 2018).

35

McKool Smith, P.C.

methods claimed in the '319 Patent by allowing a user to playback a program recorded on another device using an IPG implemented on user television equipment on the Comcast X1 system.

109.   Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, at least claims 1-3, 5-10, 12-17, 19-21, 23-25, and 27-29 of the '319 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for sale, selling, offering for lease, leasing in the United States, and/or importing into the United States without authority or license, set-top boxes, including without limitation, one or more of the '319 Accused Products and associated software (including at least the Xfinity branded IPG) that are used to infringe the '319 Patent. Upon information and belief after reasonable investigation, each of the '319 Accused Products are designed to be and are used with each other and Comcast's servers to enable a user to playback a recording from another device.

110.   Comcast is an active inducer of infringement of one or more claims of the '319 Patent under 35 U.S.C. § 271(b). Upon information and belief, one or more of the '319 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) at least claims 1-3, 5-10, 12-17, 19-21, 23-25, and 27-29 of the '319 Patent, literally and/or under the doctrine of equivalents.

111.   This Complaint will serve as notice to Comcast of the '319 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

112.   Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '319 Patent.

113.   Comcast provides the '319 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '319 Accused Products in a directly infringing manner. Comcast markets the Xfinity System to subscribers by touting that

36

MᴄKᴏᴏʟ Sᴍɪᴛʜ, P.C.

"X1 AnyRoom DVR allows you to watch recorded shows on any X1 TV Box you have in the home."[29] Comcast provides instructions to its subscribers on how to use the functionality of the '319 Patent on this website as well. Comcast further instructs its subscribers how to use X1 AnyRoom DVR to watch recorded shows on any X1 TV Box they have in the home.

114.  Comcast subscribers directly infringe by using the '319 Accused Products in their intended manner. Comcast induces such infringement by providing the '319 Accused Products and instructions to enable and facilitate infringement. Upon information and belief, Comcast specifically intends that its actions will result in infringement of the '319 Patent or has taken deliberate actions to avoid learning of infringement.

115.  Additional allegations regarding Comcast's knowledge of the '319 Patent may have evidentiary support after a reasonable opportunity for discovery.

116.  Comcast's infringement of the '319 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

117.  Rovi has been damaged by Comcast's infringement of the '319 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

118.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '319 Patent, including without limitation, lost profits and not less than a reasonable royalty.

---

[29]     *X1 AnyRoom DVR – What It Is and How It Works,* XFINITY,
https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 15, 2018).

**SECOND CLAIM FOR RELIEF**

**INFRINGEMENT OF U.S. PATENT NO. 8,448,215**

119.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-118 of this Complaint.

120.  The '215 Patent is valid and enforceable under United States Patent Laws.

121.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '215 Patent.

122.  A certified copy of the '215 Patent is attached as Exhibit B.

**The '215 Patent**

123.  The '215 Patent describes, among other things, an interactive program guide method and system for transferring programs from one device to another in response to receiving a user selection of a program listing and storing the program on the second device.

124.  As the '215 Patent describes, the user may transfer a recorded program to a secondary storage device:

> The program guide may also allow the user to transfer programs and super-programs stored on digital storage device 49 to other volumes of digital storage device 49 or to secondary storage device 47 (FIG. 3). Secondary storage device 47 may be another storage device available in the home network system like a videocassette recorder, a recordable digital video disc device, a computer (with an appropriate storage device), or other digital storage device. This feature may be accessed by, for example, issuing appropriate commands with user interface 46. If user interface 46 is a remote control such as remote control 40 of FIG. 2, the user may use a "record" or "transfer" key when in the super-program screen, or; for example, the user may select a "transfer" option from an on-screen list of options provided by the program guide in response to the user selecting a super-program from directory listing screen 90.

'215 Patent at 13:44-59.

McKool Smith, P.C.

125.   The transfer of the recorded program is performed using the program guide:

> The program guide responds to this indication by issuing appropriate instructions to digital storage device 49 to read the selected programs and associated data or the programs and associated data of the selected super-program sequence. The program guide then transfers the programs and associated data (if possible) in an appropriate format to secondary program data storage device 47. If, for example, secondary storage device 47 is a videocassette recorder, the program guide directs user television equipment 22 to convert the digitally stored program or super-program into an appropriate analog format.

'215 Patent at 13:60-14:3.

126.   The user initiates the transfer through a user input interface, such as a touchscreen on a mobile device:

> The user controls the operation of user television equipment 22 with user input interface 46. User input interface 46 may be a pointing device, wireless remote control, keyboard, touch-pad, voice recognition system, or any other suitable user input device. To watch television, the user instructs control circuitry 42 to display a desired television channel on monitor 45. To access the features of the program guide, the user instructs the program guide implemented on user television equipment 22 to generate a main menu or a desired program guide display screen for display on monitor 45.

'215 Patent at 4:52-61.

127.  Figure 1 of the '215 Patent is a schematic block diagram of a system in accordance with the present invention.

MCKOOL SMITH, P.C.



*FIG. 1*

### Historical Context of the '215 Patent

128.  As detailed above, the '215 Patent relates to interactive program guide systems in which programs can be transferred to and stored on multiple devices.

129.  Over the years, cable, satellite and broadcast television providers have offered a large number of television channels. Users traditionally consulted printed television program schedules to determine programs being broadcast at a particular time. '215 Patent at 1:22-26. And at the time of the '215 patent, interactive electronic television program guides allowed users to navigate through television program listings displayed on user televisions with remote controls. '215 Patent at 1:26-31. These interactive program guides often organized program listings in a program listings grid, wherein each row corresponded to a different program and each column corresponded to a different broadcast time. '215 Patent at 1:31-41.

130.  Interactive television guides allowed for storage of programs selected within the program guide on independent storage devices, such as videocassette

40

recorders. '215 Patent at 1:42-45. However, independent storage devices such as videocassette recorders did not allow for the more advanced features possible with the interactive program guide, including the ability to use the interactive program guide to store a program on multiple storage devices. *See* '215 Patent at 1:48-51.

131.  The inventors of the '215 Patent disclosed novel methods and systems that provided the ability to transfer and store programs on multiple storage devices using the interactive program guide.

### '215 Patent Allegations

132.  On information and belief after reasonable investigation, Comcast markets the infringing functionality as the "Download" feature available on the Xfinity Stream App for both On Demand and Cloud DVR recordings.[30] On information and belief after reasonable investigation, Comcast provides the X1 system, which allows a user to transfer an On Demand program or recording from one storage device to another storage device using an IPG implemented on user equipment (the '215 Accused Products). Further, on information and belief after reasonable investigation, Comcast performs the methods claimed in the '215 Patent by allowing a user to transfer an On Demand program or recording from one storage device to another storage device using an IPG implemented on user television equipment in the Comcast X1 system.

133.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, at least claims 1-4, 6-8, 10, 11-14, 16-18, and 20 of the '215 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for sale/lease, leasing, distributing in the United States, and/or importing into the United States without authority or license,

[30]     *Download Cloud-Based DVR Recordings and Xfinity On Demand Content to Your Device*, XFINITY, https://www.xfinity.com/support/articles/x1-xfinity-tv-app-download-a-program (last visited Oct. 10, 2018).

set-top boxes, including without limitation, one or more of the Accused Products ('215 Accused Products) and associated software (including at least the Xfinity branded IPG and mobile applications) that are used to infringe one or more claims of the '215 Patent. On information and belief after reasonable investigation, each of the '215 Accused Products are designed to be and are used with each other and Comcast's servers to enable a user to transfer an On Demand program or recording from one storage device to another storage device.

134.  Comcast has been, and currently is, an active inducer of infringement of one or more claims of the '215 Patent under 35 U.S.C. § 271(b). On information and belief after reasonable investigation, one or more of the '215 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) one or more claims of the '215 Patent, literally and/or under the doctrine of equivalents.

135.  Comcast has had actual knowledge of the '215 Patent since at least September 23, 2014, when Rovi provided claim charts to Comcast mapping the Defendants' products to the '215 Patent.

136.  Rovi again provided Comcast notice of the '215 Patent by identifying the '215 Patent in a list of Rovi patents sent to Comcast in April 2015.

137.  This Complaint will serve as notice to Comcast of the '215 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

138.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '215 Patent.

139.  Comcast provides the '215 Accused Products and instructions to Xfinity subscribers so that subscribers will use the '215 Accused Products in a directly infringing manner. Comcast markets the Xfinity System to subscribers by touting that

McKool Smith, P.C.

42

subscribers can "download your favorites to watch anywhere, even if you're offline. It's all included with any Xfinity TV package."[31] Comcast provides instructions to its subscribers on how to use the functionality of the '215 Patent and states that subscribers can "[l]earn how to download cloud-based DVR recordings and available Xfinity On Demand content to your Apple or Android device. We'll show you how to download and check in recordings and On Demand programs using the Apple version of the mobile app. The procedures are essentially the same for the Android mobile app, but the steps or screens may be slightly different."[32]

140.  Comcast subscribers directly infringe by using the '215 Accused Products in their intended manner. Comcast induces such infringement by providing the '215 Accused Products and instructions to enable and facilitate infringement. On information and belief, Comcast specifically intend that its actions will result in infringement of the '215 Patent or has taken deliberate actions to avoid learning of infringement.

141.  Additional allegations regarding Comcast's knowledge of the '215 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

142.  Comcast's infringement of the '215 Patent is willful and deliberate, entitling Rovi to enhanced damages and attorneys' fees.

143.  Comcast's infringement of the '215 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

---

[31]   *Our Best Streaming Experience*, XFINITY, https://www.xfinity.com/get-stream (last visited Oct. 10, 2018).

[32]   *Download Cloud-Based DVR Recordings and Xfinity On Demand Content to Your Device*, XFINITY, https://www.xfinity.com/support/articles/x1-xfinity-tv-app-download-a-program (last visited Oct. 10, 2018).

McKOOL SMITH, P.C.

MCKOOL SMITH, P.C.

144.  Rovi has been damaged by Comcast's infringement of the '215 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

145.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '215 Patent, including without limitation, lost profits and not less than a reasonable royalty.

### THIRD CLAIM FOR RELIEF

### INFRINGEMENT OF U.S. PATENT NO. 8,973,069

146.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-145 of this Complaint.

147.  The '069 Patent is valid and enforceable under United States Patent Laws.

148.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '069 Patent.

149.  A certified copy of the '069 Patent is attached as Exhibit C.

### The '069 Patent

150.  The '069 Patent describes, among other things, an interactive method and system for pausing media content displayed on a first user equipment device, storing position information indicative of the pause point, receiving an indication at a second user equipment device to view the media content, and presenting options to a user that are determinative of the viewing point from which the media content is displayed on the second user equipment device. The specification of the '069 Patent refers to this functionality as "relocate." E.g., '069 Patent at 10:27-39.

44

151. As the '069 Patent describes, the relocate feature allows a user to pause a program and resume from another location:

> A relocate feature may be included in the on-demand media system. This relocate feature may allow a user to freeze media-on demand content being presented on one user equipment and switch to some other user equipment to resume the presentation of the media on-demand content (i.e., resume from the point at which the user had frozen the content). The user equipment may be equipment such as user equipment 260 and 265 of FIG. 2. If the user wants to continue watching the on-demand media content at a friends house (e.g., user equipment system 265 of FIG. 2), the user may only have to use the relocate feature to freeze the on-demand media content and relocate to the friend's house to resume the on-demand media content.

'069 Patent at 10:27-39.

152. The relocate feature may be implemented using a server to pause and resume the program:

> When the relocate feature is first selected by a user, remote server network 110 of FIG. 1 may, for example, pause the on-demand media content being viewed by the user and store a content location reference to an appropriate user-specific account. After the user switches to a different location and requests that the paused content be appropriately delivered, remote server network 110 may retrieve the appropriate content location reference and continue delivering the media content from the point at which the user paused the content. Before the media content may be delivered, the remote server network may require that the user be identified so that the appropriate user-specific data and/or a user-specific account information, may be located and accessed.

'069 Patent at 11:10-22.

153. The server saves the position information for the program to identify where the program was paused:

> The on-demand media system may then save the user's current position (step 763) when the user selects the relocate feature. Saving the current position may involve, for example, saving a pointer that identifies where the media content was 'frozen' or paused by the relocate feature. If the user was identified in step 771, process 760 may store any data relevant to the operation of the relocate feature in storage space associated with the user. If desired, saving the current position may involve recording the media content

45

from the point at which the relocate feature was chosen. At step 764, process 760 may enter an idle mode until a user selects to resume reception. Step 764 may include step 772 for identifying the current user (e.g., identifying a current user on a second user equipment). Step 772 may be performed when a user selects to resume media using the relocate feature. At step 772, the system may provide a current user with the ability to log into the on-demand media system, which may include prompting the user for an identification and/or password. If desired, step 772 may be performed before the current user selects to resume media using the relocate feature.

'069 Patent at 11:51-12:3.

154.   The '069 Patent provides an exemplary relocation display screen for resuming the paused program:

FIG. 7B shows illustrative relocation display screen 750 that may be displayed when a command from remote control 300 of FIG. 3 is selected or when an appropriate option on an on-demand media display screen is selected to resume on-demand media that was frozen earlier by the user, Option 740 may be selected if a user wants to start to view the media from the frozen point on user equipment that is different (e.g., different household, different subscriber site, different room, different equipment platform, etc.) than that which was used to freeze the media.



'069 Patent at 10:54-63.

155.   The system allows the program to be presented from the pause point at a different location using different equipment:

When a user selects continue option 740, the media may be presented on the current user equipment starting from the frozen point. If desired, media may be queued to the frozen

46

point for presentation to a user when a user who had previously selected a freeze (or relocated) option logs into the system. Also, if desired, the media may be queued selectively upon user request (e.g., user selects a resume from frozen point option). If the user has not previously logged in or otherwise been identified, the user may be asked to log in or asked to provide identification information when making a resume request. The system may also allow the user to select from multiple programs which may have been previously frozen by the user.

'069 Patent at 10:64-11:9.

### Historical Context of the '069 Patent

156.  At the time of the '069 Patent, set-top boxes received on-demand video from cable system headends, and set-top boxes could communicate that on-demand video to local devices such as television sets. However, these systems were deficient in that they did not allow users to continue watching on-demand programs from a different location (e.g., another room). '069 Patent at 1:25-35.

157.  Also at the time of the '069 Patent, systems used recording technology, such as hard disk technology, to store videos of programs locally. However, these systems were deficient in that they did not allow users continued access to recorded materials from another location (e.g., another room). '069 Patent at 1:36-46.

158.   Systems existed that included a return path from a user's set-top box to a cable system headend. This allowed for client-server-based program guides that used two-way communication between cable system headends and set-top boxes. Some of these client-server television program guides recorded programs on a remote server. However, these arrangements were still deficient in providing mobility features that would allow users to relocate and still access programming.

159.  The inventors of the '069 Patent disclosed novel interactive media guide methods and systems that allowed users to begin watching media content on one user equipment device and thereafter display the same media content on a second user

47

McKool Smith, P.C.

equipment device with options as to the viewing point at which to resume the media content.

### '069 Patent Allegations

160.  On information and belief after reasonable investigation, Comcast markets this infringing functionality as "AnyRoom DVR"[33] and "Xfinity Stream."[34] On information and belief after reasonable investigation, Comcast provides the X1 system, which allows a user to pause media content on one device and continue watching the media content on another device using an interactive program guide implemented at least in part on user equipment (the '069 Accused Products). Further, on information and belief after reasonable investigation, Comcast performs the methods claimed in the '069 Patent by allowing a user to pause media content on one device and continue watching the media content on another device using an interactive program guide implemented on user television equipment in the X1 system.

161.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, at least claims 1-3, 9, 11-13, and 19 of the '069 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for lease, leasing, distributing in the United States, and/or importing into the United States without authority or license, set-top boxes, including without limitation, one or more of the '069 Accused Products and associated software (including at least the Xfinity branded IPG) that are used to infringe the '069 Patent. On information and belief after reasonable investigation, the

---

[33]    *X1 AnyRoom DVR – What it is and How it Works*, XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 11, 2018).

[34]    *Xfinity Stream TV App*, XFINITY, https://www.xfinity.com/get-stream (last visited Oct. 11, 2018).

McKool Smith, P.C.

'069 Accused Products are designed to be and are used with each other and Comcast's servers to enable a user to pause media content on a first user equipment device and resume the media content on a second device. On information and belief after reasonable investigation, Comcast markets this infringing functionality as "AnyRoom DVR"[35] and "Xfinity Stream."[36] On information and belief after reasonable investigation, Comcast provides the '069 Accused Products, which allow a user to pause media content on one device and continue watching the media content on another device using an interactive program guide implemented at least in part on user equipment devices. Further, on information and belief after reasonable investigation, Comcast performs the methods claimed in the '069 Patent by allowing a user to pause media content on one device and continue watching the media content on another device using an interactive program guide implemented on user equipment devices in the X1 system.

162.  Comcast is an active inducer of infringement of one or more claims of the '069 Patent under 35 U.S.C. § 271(b). On information and belief after reasonable investigation, one or more of the '069 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) one or more claims of the '069 Patent, literally and/or under the doctrine of equivalents.

163.  This Complaint will serve as notice to Comcast of the '069 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

---

[35]    *X1 AnyRoom DVR – What it is and How it works*, XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 11, 2018).
[36]    *Xfinity Stream TV App*, XFINITY, https://www.xfinity.com/get-stream (last visited Oct. 11, 2018).

164.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '069 Patent.

165.  Comcast provides the '069 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '069 Accused Products in a directly infringing manner. Comcast markets the Xfinity System to subscribers by touting the ability to "[b]egin a recorded show on your TV and resume watching it on another TV"[37] and the ability to "[g]et the entertainment you love anywhere, on any device."[38] Comcast provides instructions to its subscribers on how to use the functionality of the '069 Patent on these websites.

166.  Comcast subscribers directly infringe by using the '069 Accused Products in their intended manner. Comcast induces such infringement by providing the '069 Accused Products and instructions to enable and facilitate infringement. On information and belief after reasonable investigation, Comcast specifically intends that its actions will result in infringement of the '069 Patent or has taken deliberate actions to avoid learning of infringement.

167.  Additional allegations regarding Comcast's knowledge of the '069 Patent may have evidentiary support after a reasonable opportunity for discovery.

168.  Comcast's infringement of the '069 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

169.  Rovi has been damaged by Comcast's infringement of the '069 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate

---

[37]    *X1 AnyRoom DVR – What it is and How it Works*, XFINITY, https://www.xfinity.com/support/articles/x1-anyroom-dvr-overview (last visited Oct. 11, 2018).
[38]    *Xfinity Stream TV App*, XFINITY, https://www.xfinity.com/get-stream (last visited Oct. 11, 2018).

McKool Smith, P.C.

remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

170.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '069 Patent, including without limitation, lost profits and not less than a reasonable royalty.

## FOURTH CLAIM FOR RELIEF

### INFRINGEMENT OF U.S. PATENT NO. 7,873,978

171.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-170 of this Complaint.

172.  The '978 Patent is valid and enforceable under United States Patent Laws.

173.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '978 Patent.

174.  A certified copy of the '978 Patent is attached as Exhibit D.

### The '978 Patent

175.  The '978 Patent describes, among other things, an interactive television program guide system in which television programs are recorded and retrieved on-demand and stored for later playback for a number of users. The patent discloses generating a record request with an interactive program guide for a user, recording a program with a remote media server in response to the record request, generating a retrieval request with an interactive program guide for a user, retrieving the program with the remote media server, and storing the retrieved program for later playback.

176.  As the '978 Patent describes, an interactive program guide may be used to record and playback programs using a server:

> Programs and program guide data may be recorded and played back on-demand by remote media server 24 in response to record and playback requests. Record and playback requests may be generated by a program guide

51

McKool Smith, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith, P.C.

> server application or web application implemented on Internet service system 235. Record and playback requests may also be generated by an interactive program guide client implemented on personal computer 231 and may be provided to remote media server 24 by Internet service system 235. Programs and program guide data may be provided by Internet service system 235 to personal computer 231 using a suitable real-time Internet video approach (e.g., using the M-Bone), or may be downloaded and stored by personal computer 231 for playback.

'978 Patent at 8:40-53.

177. The server may also record data associated with the program selected for recording:

> Remote media server 24 of FIGS. 2a, 2b, 2c, 2d, and 2e records programs, program guide data, or any suitable combination thereof and supplies either or both to user television equipment 22 in response to requests generated by the program guide. Remote media server 24 may also record program associated data, such as data carried in the vertical blanking interval (VBI) of an analog television channel or in a digital data track on a digital television channel. Examples of program associated data are subtitles, text tracks, music information tracks, additional video formats, additional languages, or other additional data. As used herein, recording and playing back "programming" or "programs" may include, but does not require, recording and playing back program associated data. Remote media server 24 is shown as being located at program guide distribution facility 16, but may be located at a separate distribution facility (e.g., a cable system headend, a broadcast distribution facility, a satellite television distribution facility, or any other suitable type of television distribution facility).

'978 Patent at 8:54-9:5.

178. Figure 2e of the '978 Patent is an exemplary schematic diagram of an equipment environment in which a preferred embodiment of the interactive program guide system of the '978 Patent can operate.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKool Smith, P.C.

*FIG. 2e*

179.  In response to a retrieval request generated by an interactive program guide, the server may retrieve recorded programs from storage on demand for later playback:

> Remote media server 24 retrieves programs from storage 15 in response to retrieval requests generated by the program guides implemented on interactive program guide television equipment 17. Processing circuitry 11 may process the requests by searching a user's user directory 59 for the requested programs and then issuing a suitable retrieval command (or request) to storage 15 based on the pointer in the directory. For example, when user 1 requests the playing of PROGRAM 1, processing circuitry 11 issues an appropriate retrieval command to optical storage tower 53. The program is retrieved from media store 63 and may be passed to memory 13 (e.g., via DMA circuitry in processing circuitry 11) for decoding by processing circuitry 11 and distribution to user television equipment 22. If desired, processing circuitry may pass a requested program in its digital form to distribution equipment 21 for distribution to user television equipment 22.

'978 Patent at 11:65-12:14.

53

McKool Smith, P.C.

## Historical Context of the '978 Patent

180.  Cable, satellite, and broadcast television providers offer a large number of television channels. In the past, viewers had to consult printed television program schedules to determine which programs were being broadcast at particular times. '978 Patent at 1:20-24. In the years leading up to the '978 Patent, interactive electronic television program guides allowed users to more easily navigate television program information with the use of a remote control. '978 Patent at 1:24-28. These interactive television program guides typically organized the various television program listings in a list, grid, or table. '978 Patent at 1:28-31.

181.  Some systems allowed for programs selected with a STB to be recorded and stored on a videocassette recorder (VCR). While the use of a VCR provided the benefits of basic recording, the functionality was very limited. '978 Patent at 1:32-61.

182.  Other systems that used hard disk technology to store programs were available, but these systems suffered from the need for multiple additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '978 Patent at 1:62-2:6.

183.  Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available or were limited to only a subset of programs that the operator decided to record. '978 Patent at 2:15-23.

184.  The inventors of the '978 Patent disclosed novel systems and methods that provided an interactive television program guide system in which television programs are recorded and retrieved on-demand and stored for later playback for a number of users.

## '978 Patent Allegations

185.  On information and belief after reasonable investigation, Comcast markets the infringing functionality as the "Download" feature available on the

54

Xfinity Stream App for both On Demand and Cloud DVR recordings.[39] On information and belief after reasonable investigation, Comcast provides the X1 system, which allow subscribers to request to record programs at remote servers and request to retrieve the recorded programs for storage and later playback using an IPG implemented on user television equipment (the '978 Accused Products). Further, on information and belief after reasonable investigation, Comcast performs the methods claimed in the '978 Patent by allowing a user to record programs at remote servers and retrieve the recorded programs for storage and later playback.

186.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, claims 1-8 of the '978 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for lease, leasing, distributing in the United States, and/or importing into the United States without authority or license, set-top boxes, including without limitation, one or more of the '978 Accused Products that infringe claims 1-8 of the '978 Patent. On information and belief after reasonable investigation, each of the '978 Accused Products are designed to be and are used with each other and Comcast's servers to record programs at remote servers and retrieve the recorded programs for storage and later playback in response to user requests with an interactive program guide.

187.  Comcast has been, and currently is, an active inducer of infringement of claims 1-8 of the '978 Patent under 35 U.S.C. § 271(b). On information and belief after reasonable investigation, one or more of the '978 Accused Products of the Comcast directly and/or indirectly infringes (by induced infringement) claims 1-8 of the '978 Patent, literally and/or under the doctrine of equivalents.

---

[39]  *Download Cloud-Based DVR Recordings and Xfinity On Demand Content to Your Device*, XFINITY, https://www.xfinity.com/support/articles/x1-xfinity-tv-app-download-a-program (last visited Oct. 10, 2018).

188.  Comcast has had actual knowledge of the '978 Patent since at least September 23, 2014, when Rovi provided a claim chart of the '978 Patent mapping Comcast's infringing functionality to the claims of the '978 Patent.

189.  Rovi again provided Comcast notice of the '978 Patent by identifying the '978 Patent in a list of Rovi patents sent to Comcast in April 2015.

190.  This Complaint will serve as notice to Comcast of the '978 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

191.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '978 Patent.

192.  Comcast provides the '978 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '978 Accused Products in a directly infringing manner. Comcast markets the Xfinity System to subscribers and provides instructions to its subscribers on how to "download cloud-based DVR recordings and available Xfinity On Demand content" to devices for later playback.[40]

193.  Comcast subscribers directly infringe by using the '978 Accused Products in their intended manner. Comcast induces such infringement by providing the '978 Accused Products and instructions to enable and facilitate infringement. *Id*. On information and belief after reasonable investigation, Comcast specifically intends that its actions will result in infringement of the '978 Patent or has taken deliberate actions to avoid learning of infringement.

194.  Additional allegations regarding Comcast's knowledge of the '978 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

---

[40]     *Download Cloud-Based DVR Recordings and Xfinity On Demand Content to Your Device*, XFINITY, https://www.xfinity.com/support/articles/x1-xfinity-tv-app-download-a-program (last visited Oct. 11, 2018).

195.  Comcast's infringement of the '978 Patent is willful and deliberate, entitling Rovi to enhanced damages and attorneys' fees.

196.  Comcast's infringement of the '978 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

197.  Rovi has been damaged by Comcast's infringement of the '978 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

198.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '978 Patent, including without limitation, lost profits and not less than a reasonable royalty.

## FIFTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 9,232,254

199.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1- 198 of this Complaint.

200.  The '254 Patent is valid and enforceable under United States Patent Laws.

201.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '254 Patent.

202.  A certified copy of the '254 Patent is attached as Exhibit E.

## The '254 Patent

203.  The '254 Patent describes, among other things, a method and system of providing users with access to respective directories of recorded programs recorded at a remote server using a program guide. The '254 Patent discloses receiving a

McKool Smith, P.C.

57

program at a remote server from a broadcast source, recording the program on the remote server in response to a request from a user equipment on a network different than that of the remote server, and maintaining and enabling access to respective user directories for each user of a plurality of user equipment.

204. As the '254 Patent describes, an interactive program guide may be used to record and playback programs using a server:

> Programs and program guide data may be recorded and played back on-demand by remote media server 24 in response to record and playback requests. Record and playback requests may be generated by a program guide server application or web application implemented on Internet service system 235. Record and playback requests may also be generated by an interactive program guide client implemented on personal computer 231 and may be provided to remote media server 24 by Internet service system 235. Programs and program guide data may be provided by Internet service system 235 to personal computer 231 using a suitable real-time Internet video approach (e.g., using the M-Bone), or may be downloaded and stored by personal computer 231 for playback.

'254 Patent at 8:47-60.

205. The server may also record data associated with the program selected for recording:

> Remote media server 24 of FIGS. 2 a, 2 b, 2 c, 2 d, and 2 e records programs, program guide data, or any suitable combination thereof and supplies either or both to user television equipment 22 in response to requests generated by the program guide. Remote media server 24 may also record program associated data, such as data carried in the vertical blanking interval (VBI) of an analog television channel or in a digital data track on a digital television channel. Examples of program associated data are subtitles, text tracks, music information tracks, additional video formats, additional languages, or other additional data. As used herein, recording and playing back "programming" or "programs" may include, but does not require, recording and playing back program associated data.

'254 Patent at 8:61-9:7.

206. The user can access the directory of recorded programs in a number of ways and the system may use an overlay to display the directory:

McKool Smith, P.C.

McKool Smith, P.C.

> The program guide may provide the user with the opportunity to access a directory or other such list of programs that have been recorded for the user on remote media server 24 or local media server 29. The user may indicate a desire to access a directory or list of recorded programs by, for example, pressing a "DIR" key on remote control 40 or selecting a "Directory" feature from main menu 107. FIGS. 18 a and 18 b show illustrative overlays 320 that may be displayed by the program guide when the user indicates a desire to view a directory of the programs that the user has recorded on remote media server 24 or local media server 29. FIG. 18 a shows overlay 320 overlaid on top of the video of the channel that the viewer is watching. FIG. 18 b shows overlay 32 overlaid on top of a program listings screen. Overlay 320 may display any information related to the programming that the user has selected for recording by remote media server 24 or local media server 29. Overlay 320 may display, for example, the channels and titles of the recorded programs, the dates and times they are recorded, or any other suitable information.

'254 Patent at 22:45-63.

207.  The '254 Patent describes an illustrative directory screen for the directory of recorded programs:

> FIG. 18 d shows an illustrative directory screen 350 that may be displayed by the program guide when the user indicates a desire to view a directory of the programs that the user has recorded on remote media server 24 or local media server 29. Directory screen 350 may display program-related information like that displayed by overlay 320. Directory screen 350 may also include other program guide display screen elements, such as selectable advertisements, service provider logos, brand logos, advertisement banners, etc. If desired, directory screen 350 may be displayed as an overlay and any of the overlays described herein may be presented as display screens. Such display screens may be either full screen display screens or partial screen display screens. Partial screen display screens may contain a reduced-size video window (e.g., for displaying the current television channel).

'254 at 23:11-25.

208.  The '254 Patent provides the illustrative directory screen that may be displayed:

> FIG. 18 d shows an illustrative directory screen that may be displayed by the program guide when a user indicates a desire to access a directory of programs recorded for a user on the remote media server of FIGS. 2 a-2 e or the local

59

media server of FIG. 7.



FIG. 18d

**Historical Context of the '254 Patent**

209.  Cable, satellite, and broadcast television providers offer viewers a large number of television channels. At the time of the '254 Patent, viewers had to consult printed television program schedules to determine which programs were being broadcast at particular times. '254 Patent at 1:24-28. Also at the time of the '254 Patent, interactive electronic television program guides allowed users to more easily navigate television program information with the use of a remote control. '254 Patent at 1:30-32. These interactive television program guides typically organized the various television program listings in a list, grid, or table. '254 Patent at 1:32-35.

60

210.  Some systems allowed for programs selected with a STB to be recorded and stored on a VCR. While the use of a VCR provided the benefits of basic recording, the functionality was very limited. '254 Patent at 1:36-65.

211.  Other systems that used hard disk technology to store programs were available, but these systems suffered from the need for multiple additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '254 Patent at 1:66-2:10.

212.  Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available or were limited to only a subset of programs that the operator decided to record. '254 Patent at 2:19-26.

213.  The inventors of the '254 Patent disclosed novel systems and methods that provided an interactive television program guide system that provides users with access to respective directories of recorded programs recorded at a remote server.

### '254 Patent Allegations

214.  On information and belief after reasonable investigation, Comcast markets this infringing functionality as "Cloud DVR."[41] On information and belief after reasonable investigation, Comcast provides the X1 system, which allows subscribers to request recordings on remote servers and access their respective user directories of recorded programs on remote servers using an IPG implemented on user television equipment (the '254 Accused Products). On information and belief after reasonable investigation, Comcast performs the methods claimed in the '254 Patent by allowing subscribers to request recordings on remote servers and access their respective user directories of recorded programs on remote servers.

---

[41]    *X1 Cloud DVR FAQs*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Oct. 12, 2018).

McKool Smith, P.C.

215.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, at least claims 1-8, 10-19, and 21-22 of the '254 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for lease, leasing, distributing in the United States, and/or importing into the United States without authority or license, set-top boxes, including without limitation, one or more of the '254 Accused Products that infringe the '254 Patent. On information and belief after reasonable investigation, each of the '254 Accused Products are designed to be and are used with each other and Comcast's servers to enable subscribers to schedule recordings on remote servers and to provide subscribers with access to respective directories of recorded programs recorded at a remote server.

216.  Comcast is an active inducer of infringement of at least claims 1-8, 10-19, and 21-22 of the '254 Patent under 35 U.S.C. § 271(b). On information and belief after reasonable, one or more of the '254 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) at least claims 1-8, 10-19, and 21-22 of the '254 Patent, literally and/or under the doctrine of equivalents.

217.  This Complaint will serve as notice to Comcast of the '254 Patent and its infringement should Comcast contend that they did not previously have knowledge thereof.

218.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '254 Patent.

219.  Comcast provides the '254 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '254 Accused Products in a directly infringing manner. Comcast markets the Xfinity System to subscribers by touting the ability to "record TV shows and movies in 'the cloud.'"[42] Comcast provides

---

[42]    *Record and Play Back Programs with X1 Cloud DVR*, XFINITY,

McKOOL SMITH, P.C.

McKool Smith, P.C.

instructions to its subscribers on how to use the functionality of the '254 Patent on Comcast's websites.[43]

220.  Comcast subscribers directly infringe by using the '254 Accused Products in their intended manner to infringe. Comcast induces such infringement by providing the '254 Accused Products and instructions to enable and facilitate infringement.[44] On information and belief after reasonable investigation, Comcast specifically intends that its actions will result in infringement of the '254 Patent or has taken deliberate actions to avoid learning of infringement.

221.  Additional allegations regarding Comcast's knowledge of the '254 Patent may have evidentiary support after a reasonable opportunity for discovery.

222.  Comcast's infringement of the '254 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

223.  Rovi has been damaged by Comcast's infringement of the '956 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

224.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '254 Patent, including without limitation, lost profits and not less than a reasonable royalty.

---

https://www.xfinity.com/support/articles/x1-dvr-with-cloud-technology-recording-and-playback (last visited Oct. 12, 2018).

[43]   *See, e.g.*, *X1 Cloud DVR FAQs*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Oct. 12, 2018).

[44]   *Id.*

## SIXTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 8,272,019

225. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1- 224 of this Complaint.

226. The '019 Patent is valid and enforceable under United States Patent Laws.

227. Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '019 Patent.

228. A certified copy of the '019 Patent is attached as Exhibit F.

### The '019 Patent

229. The '019 Patent describes, among other things, a method and system for managing programs stored on a remote media server. The patent discloses providing user equipment with data associated with a list of programs stored at the media server, receiving delete requests from program guides displayed at user equipment, and responsively deleting programs from a remote media server.

230. As the '019 Patent describes, a server may record programs selected for recording:

> The remote media server may be located at a program guide distribution facility or other suitable distribution facility (e.g., a cable system headend, a broadcast distribution facility, a satellite television distribution facility, or any other suitable type of television distribution facility). The remote media server may record programs and, if desired, program guide data. The remote media server may also record data associated with programs, such as data carried in a vertical blanking interval (VBI) or in a digital data track. The programs, program associated data, program guide data or any suitable combination thereof, may be recorded in response to requests generated by the interactive television program guide. Programs recorded by the remote media server may be distributed to users using any suitable video-on-demand or near-video-on-demand approach. Users may also have local media servers (e.g., personal computers) in their homes for recording programs and, if desired, program guide data.

64

'019 Patent at 3:1-21.

231.   The server may also record data associated with the program selected for recording:

> Remote media server 24 of FIGS. 2 a, 2 b, 2 c, 2 d, and 2 e records programs, program guide data, or any suitable combination thereof and supplies either or both to user television equipment 22 in response to requests generated by the program guide. Remote media server 24 may also record program associated data, such as data carried in the vertical blanking interval (VBI) of an analog television channel or in a digital data track on a digital television channel. Examples of program associated data are subtitles, text tracks, music information tracks, additional video formats, additional languages, or other additional data. As used herein, recording and playing back "programming" or "programs" may include, but does not require, recording and playing back program associated data. Remote media server 24 is shown as being located at program guide distribution facility 16, but may be located at a separate distribution facility (e.g., a cable system headend, a broadcast distribution facility, a satellite television distribution facility, or any other suitable type of television distribution facility).

'019 Patent at 8:57-9:8.

232.   The '019 Patent describes the hardware and software for the server recording the programs:

> Remote media server 24 may be based on any suitable combination of hardware and software suitable for recording and playing back programs or program guide data on demand. As defined herein, the phrase "recording on-demand" refers to recording a program or program guide data in response to a user's selection of a program for recording. The actual recording of a program need not take place at the same time that such a selection is made. For example, a program may be selected for recording before its scheduled broadcast time and may be recorded when the selected program is aired.
>
> Remote media server 24 may include processing circuitry 11, memory 13, and storage 15. Processing circuitry 11 may include any suitable processor, such as a microprocessor or group of microprocessors, and other processing circuitry such as caching circuitry, direct memory access (DMA) circuitry, digitizing circuitry, and input/output (I/O) circuitry. Processing circuitry 11 may also include circuitry suitable for decoding program and data files stored on storage 15 and converting them to suitable video signals for distribution by distribution equipment 21. If programming is

65

stored as Moving Pictures Experts Group (MPEG) MPEG-2 files, processing circuitry 11 may include, for example, an MPEG-2 decoder for decoding the files and converting them to National Television Standards Committee (NTSC) video. In another suitable approach, processing circuitry passes the MPEG-2 files to distribution equipment 21 for distribution to users as an MPEG-2 data stream. The MPEG-2 data stream may be decoded and displayed by user television equipment 22.

'019 Patent at 9:9-37.

233.   The interactive program guide allows users to manage the stored programs, including deleting programs no longer desired:

The program guide may also provide users with an opportunity to manage what is stored on remote media server 24 and local media server 29. The program guide may, for example, provide users with an opportunity to delete programs that are no longer desired. The user may indicate a desire to delete a program by, for example, highlighting a listing for a recorded program and pressing a "DEL" key on remote control 40, by selecting an on-screen feature of a program guide display screen such as feature 159 of full information screen 161 (FIG. 20), or using any other suitable approach. When the user indicates a desire to delete a recorded program, the program guide may generate a delete request that is transmitted to remote media server 24 or local media server 29 by communications device 51. Delete requests may be any suitable request, message, object-based communication, remote procedure call, etc.

'019 Patent at 27:43-58.

234.   The server processes the delete request as appropriate and updates the directory:

After receiving a delete request, remote media server 24 (for users from within the same or different households) or local media server 29 (for users from within the same household) may determine whether more than one user has requested a copy of the selected program. If only one user has requested that the program be recorded, remote media server 24 may issue a delete command to the storage device that stores the program selected for deletion. The appropriate storage device deletes the selected program from its media store 63 (FIG. 4) and media directories 61 and user directory 59 are updated accordingly. If more than one user has requested that the program be recorded, remote media server 24 may delete the entry in user directory 59 for that program. If the program guide maintains a user directory 59, the program guide may delete the entry. Local media servers may delete

66

programs in a similar manner.

'019 Patent at 27:59-28:7.

## Historical Context of the '019 Patent

235. Cable, satellite, and broadcast television providers offer viewers a large number of television channels. At the time of the '019 Patent, viewers needed to consult printed television program schedules to determine which programs were being broadcast at particular times. '019 Patent at 1:23-26. Also at the time of the '019 Patent, interactive electronic television program guides allowed users to more easily navigate television program information with the use of a remote control. '019 Patent at 1:26-31. These interactive television program guides typically organized the various television program listings in a list, grid, or table. '019 Patent at 1:30-33.

236. Some systems allowed for programs selected with a STB to be recorded and stored on a VCR. While the use of a VCR provided the benefits of basic recording, the functionality was very limited. '019 Patent at 1:39-63.

237. Other systems that used hard disk technology to store programs were available, but these systems suffered from the need for multiple additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '019 Patent at 1:64-2:8.

238. Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available or were limited to only a subset of programs that the operator decided to record. '019 Patent at 2:17-24.

239. The inventors of the '019 Patent disclosed novel systems and methods for managing and responsively deleting programs stored on a remote media server.

67

McKool Smith, P.C.

## '019 Patent Allegations

240.  On information and belief after reasonable investigation, Comcast markets this infringing functionality as "Cloud DVR."[45] On information and belief after reasonable investigation, Comcast provides the X1 system, which allows subscribers to delete programs stored on remote servers using an IPG implemented on user television equipment (the '019 Accused Products). On information and belief after reasonable investigation, Comcast performs the methods claimed in the '019 Patent by allowing subscribers to delete programs stored on remote servers.

241.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, one or more claims of the '019 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for lease, leasing, distributing in the United States, and/or importing into the United States without authority or license, including without limitation, one or more of the Accused Products (hereafter the '019 Accused Products) that infringe at least claims 1-3 and 11-13 of the '019 Patent. On information and belief after reasonable investigation, each of the '019 Accused Products are designed to be and are used with each other and Comcast's servers to delete programs stored on remote servers.

242.  Comcast has been, and currently is, an active inducer of infringement of at least claims 1-3 and 11-13 of the '019 Patent under 35 U.S.C. § 271(b). Upon information and belief, one or more of the '019 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) at least claims 1-3 and 11-13 of the '019 Patent, literally and/or under the doctrine of equivalents.

---

[45]   *X1 Cloud DVR FAQs*, Xfinity, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Oct. 12, 2018).

McKool Smith, P.C.

243.   Comcast has had actual knowledge of the '019 Patent since at least September, 23, 2014, when Rovi provided a claim chart to Comcast illustrating Comcast's infringement of the '019 Patent.

244.   Rovi again provided Comcast notice of the '019 Patent by identifying the '019 Patent in a list of Rovi patents sent to Comcast in April 2015.

245.   This Complaint will serve as notice to Comcast of the '019 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

246.   Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '019 Patent.

247.   Comcast provides the '019 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '019 Accused Products in a directly infringing manner. Comcast provides instructions to its subscribers on how to use the functionality of the '019 Patent on its website.[46]

248.   Comcast subscribers directly infringe by using the '019 Accused Products in their intended manner to infringe. Comcast induces such infringement by providing the '019 Accused Products and instructions to enable and facilitate infringement. Upon information and belief, Comcast specifically intends that its actions will result in infringement of the '019 Patent or has taken deliberate actions to avoid learning of infringement.

249.   Additional allegations regarding Comcast's knowledge of the '019 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

---

[46]   *X1 Cloud DVR FAQs*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Oct. 12, 2018).

250.  Comcast's infringement of the '019 Patent is willful and deliberate, entitling Rovi to enhanced damages and attorneys' fees.

251.  Comcast's infringement of the '019 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

252.  Rovi has been damaged by Comcast's infringement of the '019 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

253.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '019 Patent, including without limitation, lost profits and not less than a reasonable royalty.

## SEVENTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,735,107

254.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-253 of this Complaint.

255.  The '107 Patent is valid and enforceable under United States Patent Laws.

256.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '019 Patent.

257.  A certified copy of the '107 Patent is attached as Exhibit G.

## The '107 Patent

258.  The '107 Patent describes, among other things, a method and system of receiving a broadcast program, tuning to the broadcast program in response to a user input, recording the broadcast program on a local storage device, recording the

70

McKool Smith, P.C.

broadcast program on a remote server, and in response to a user input, allowing the user to watch a portion of the broadcast program stored on the remote server from a point prior to when the broadcast program was tuned to.

259.  As the '107 Patent describes, the system uses an interactive program guide for tuning:

> The program guide data transmitted by main facility 12 to interactive program guide television equipment 17 may include television programming data (e.g., program identifiers, times, channels, titles, and descriptions) and other data for services other than television program listings (e.g., help text, pay-per-view information, weather information, sports information, music channel information, associated Internet web links, associated software, etc.). The program guide data may also include unique identifiers for each showing of each program, identifiers for program groupings (e.g., series, mini-series, orderable packages of programs, etc.), or any other suitable identifier. As used herein television "program" and "programming" are intended to mean any type of show or advertisement carried on a regular, premium, pay-per-view, music, or other type of television channel, and may include movies, pay-per-view programs, sporting events, music programs, commercials and any other suitable type of television program.

'107 Patent at 5:60-6:10.

260.  The interactive program guide may be deployed in multiple configurations:

> The interactive television program guide may run totally on user television equipment 22 using the arrangements of FIGS. 2 a and 2 c, or may run partially on user television equipment 22 and partially on interactive program guide television equipment 17 using a suitable client-server or distributed processing arrangement such as those shown in FIGS. 2 b and 2 d. Program guide distribution facility 16 may be any suitable distribution facility, and may have distribution equipment 21.

'107 Patent at 6:33-41.

261.  Using the interactive program guide, a user may request a remote and/or local server record programs and program data:

> The remote media server may be located at a program guide distribution facility or other suitable distribution facility (e.g., a cable system headend, a broadcast distribution

71

McKool Smith, P.C.

facility, a satellite television distribution facility, or any other suitable type of television distribution facility). The remote media server may record programs and, if desired, program guide data. The remote media server may also record data associated with programs, such as data carried in a vertical blanking interval (VBI) or in a digital data track. The programs, program associated data, program guide data or any suitable combination thereof, may be recorded in response to requests generated by the interactive television program guide. Programs recorded by the remote media server may be distributed to users using any suitable video-on-demand or near-video-on-demand approach. Users may also have local media servers (e.g., personal computers) in their homes for recording programs and, if desired, program guide data.

'107 Patent at 2:63-3:12.

262.   The server may also playback recorded programs in response to a user request:

Programs and program guide data may be recorded and played back on-demand by remote media server 24 in response to record and playback requests. Record and playback requests may be generated by a program guide server application or web application implemented on Internet service system 235. Record and playback requests may also be generated by an interactive program guide client implemented on personal computer 231 and may be provided to remote media server 24 by Internet service system 235. Programs and program guide data may be provided by Internet service system 235 to personal computer 231 using a suitable real-time Internet video approach (e.g., using the M-Bone), or may be downloaded and stored by personal computer 231 for playback.

'107 Patent at 8:37-50.

## **Historical Context of the '107 Patent**

263.   Cable, satellite, and broadcast television providers offer viewers a large number of television channels. At the time of the '107 Patent, viewers needed to consult printed television program schedules to determine which programs were being broadcast at particular times. '107 Patent at 1:17-21. Also at the time of the '107 Patent, interactive electronic television program guides allowed users to more easily navigate television program information with the use of a remote control. '107

72

Patent at 1:21-25. These interactive television program guides typically organized the various television program listings in a list, grid, or table. '107 Patent at 1:25-28.

264.  Some systems allowed for programs selected with a STB to be recorded and stored on a VCR. While the use of a VCR provided the benefits of basic recording, the functionality was very limited. '107 Patent at 1:40-58.

265.  Other systems that used hard disk technology to store programs were available, but these systems suffered from the need for multiple additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '107 Patent at 1:59-2:3.

266.  Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available or were limited to only a subset of programs that the operator decided to record. '107 Patent at 2:12-19.

267.  The inventors of the '107 Patent disclosed novel systems and methods for recording broadcast programs locally and on remote servers, and allowing subscribers to watch portions of a broadcast program stored on a remote server from a point prior to when the program was tuned to by the subscriber.

### '107 Patent Allegations

268.  On information and belief after reasonable investigation, Comcast markets this infringing functionality as "Restart."[47] On information and belief after reasonable investigation, Comcast provides the X1 system, which allows subscribers to watch programs stored at a remote server from a point prior to when the program was tuned to using an IPG implemented on user television equipment (the '107 Accused Products). On information and belief after reasonable investigation,

---

[47]    *See, e.g.*, *Xfinity Community Forum*, XFINITY, https://forums.xfinity.com/t5/TV-Archive/quot-Start-from-beginning-quot-feature/td-p/2970254 (last visited Oct. 2, 2018) (containing instructions from a Comcast employee for subscribers to make use of the "Restart" feature).

McKool Smith, P.C.

Comcast performs the methods claimed in the '107 Patent by allowing subscribers to watch programs stored at a remote server from a point prior to when the program was tuned to.

269.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, one or more claims of the '107 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for lease, leasing, distributing in the United States, and/or importing into the United States without authority or license, including without limitation, one or more of the Accused Products (hereafter the '107 Accused Products) that infringe at least claims 1-4 and 9-12 of the '107 Patent. On information and belief after reasonable investigation, each of the '107 Accused Products are designed to be and are used with each other and Comcast's servers to delete programs stored on remote servers.

270.  Comcast has been, and currently is, an active inducer of infringement of at least claims 1-4 and 9-12 of the '107 Patent under 35 U.S.C. § 271(b). Upon information and belief, one or more of the '107 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) at least claims 1-4 and 9-12 of the '107 Patent, literally and/or under the doctrine of equivalents.

271.  Comcast has had actual knowledge of the '107 Patent since at least September 23, 2014, when Rovi provided a claim chart to Comcast illustrating Comcast's infringement of the '107 Patent.

272.  Rovi again provided Comcast notice of the '107 Patent by identifying the '107 Patent in a list of Rovi patents sent to Comcast in April 2015.

273.  This Complaint will serve as notice to Comcast of the '107 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

McKool Smith, P.C.

McKool Smith, P.C.

274.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '107 Patent.

275.  Comcast provides the '107 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '107 Accused Products in a directly infringing manner. Comcast provides instructions to its subscribers on how to use the functionality of the '107 Patent on its website.[48]

276.  Comcast subscribers directly infringe by using the '107 Accused Products in their intended manner to infringe. Comcast induces such infringement by providing the '107 Accused Products and instructions to enable and facilitate infringement. Comcast provides instructions to its subscribers to use the "Restart" feature to watch a program from a point prior to when the program was tuned to using a remote server.[49] Upon information and belief after reasonable investigation, Comcast specifically intends that its actions will result in infringement of the '107 Patent or has taken deliberate actions to avoid learning of infringement.

277.  Additional allegations regarding Comcast's knowledge of the '107 Patent and willful infringement will likely have evidentiary support after a reasonable opportunity for discovery.

278.  Comcast's infringement of the '107 Patent is willful and deliberate, entitling Rovi to enhanced damages and attorneys' fees.

279.  Comcast's infringement of the '107 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

---

[48]    *See, e.g.*, *Xfinity Community Forum*, XFINITY, https://forums.xfinity.com/t5/TV-Archive/quot-Start-from-beginning-quot-feature/td-p/2970254 (last visited Oct. 2, 2018) (containing instructions from a Comcast employee for subscribers to make use of the "Restart" feature).

[49]    *See, e.g.*, *Xfinity Community Forum*, XFINITY, https://forums.xfinity.com/t5/X1/Restart-Show-Command/td-p/2986131 (last visited Oct. 13, 2018) (describing a subscriber's email from Comcast regarding the "Restart This Program" feature).

75

280.  Rovi has been damaged by Comcast's infringement of the '107 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

281.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '107 Patent, including without limitation, lost profits and not less than a reasonable royalty.

## EIGHTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 9,118,948

282.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-281 of this Complaint.

283.  The '948 Patent is valid and enforceable under United States Patent Laws.

284.  Rovi Guides, Inc. owns, by assignment, all right, title, and interest in and to the '948 Patent, including the right to collect for past damages.

285.  A certified copy of the '948 Patent is attached as Exhibit H.

### The '948 Patent

286.  The '948 Patent describes, among other things, a method and system of recording multiple programs at a server in response to record requests from multiple user equipment. The patent discloses that a server receives a first record request for a first program and a second record request for a second program. The server, in response to receiving each record request, simultaneously records the second program and at least a portion of the first program.

McKool Smith, P.C.

287. As the '948 Patent describes, users may initiate record requests using an interactive program guide on user television equipment for programs that are received by a media server:

> When a user indicates a desire to record a program or program grouping on remote media server 24 or local media server 29 (and possibly a desire to confirm recording of the program), the program guide generates a record request that is transmitted to the appropriate remote media server by communications device 51 (FIG. 9) via communications path 20 or 31. The record request may include, for example, an identifier for the program that the user wishes to record, an identifier for the user, and, if desired, any other information related to the program and the user.

'948 Patent at 22:10-19.

288. Record requests may be generated by an interactive program guide, including a program guide computer application:

> Programs and program guide data may be recorded and played back on-demand by remote media server 24 in response to record and playback requests. Record and playback requests may be generated by a program guide server application or web application implemented on Internet service system 235. Record and playback requests may also be generated by an interactive program guide client implemented on personal computer 231 and may be provided to remote media server 24 by Internet service system 235.

'948 Patent at 8:47-55.

289. In response to these requests, a remote media server may record the requested programs:

> Remote media server 24 of FIGS. 2 a, 2 b, 2 c, 2 d, and 2 e records programs, program guide data, or any suitable combination thereof and supplies either or both to user television equipment 22 in response to requests generated by the program guide.

'948 Patent at 8:61-65.

290. The '948 Patent provides that a record request may be received in advance of the airing of a program such that the program is recorded by the media server when the program is aired:

COMPLAINT FOR PATENT INFRINGEMENT

McKool Smith, P.C.

McKool Smith, P.C.

> Remote media server 24 may be based on any suitable combination of hardware and software suitable for recording and playing back programs or program guide data on demand. As defined herein, the phrase "recording on-demand" refers to recording a program or program guide data in response to a user's selection of a program for recording. The actual recording of a program need not take place at the same time that such a selection is made. For example, a program may be selected for recording before its scheduled broadcast time and may be recorded when the selected program is aired.

'948 Patent at 9:14-23.

291. In response to receiving record requests, a media server may record programs and provide user directories of recorded programs:

> At the time a selected program or program in a grouping airs (which may be the time at which the program is selected for recording), remote media server 24 or local media server 29 may record the program and any associated program guide data. Program guide data may be stored as files associated with the program using pointers. Once the selected program is recorded, remote media server 24 or local media server 29 may provide a copy of user directory 59 to the program guide if the program guide maintains a copy of user directories. Alternatively, remote media server 24 or local media server 29 may provide a pointer to the location of the program on media store 63.

'948 Patent at 22:23-34.

292. The '948 Patent illustrates that multiple record requests can be handled by the media server such that multiple programs can simultaneously be recorded for multiple users:

78



'948 Patent at Fig. 5.

293.  The media server can direct multiple tuners (such as any combination of analog tuners, digital tuners, and decoders) to record at particular times in order to record multiple programs for multiple users:

> Recorder 125 may be a process running on processing circuitry 11 of remote media server 24 that is suitable for monitoring job queue 120 and recording programs on storage 15. Processing circuitry 11 of remote media server 24 may include, for example, one or more tuners, digital encoders, or digital decoders for tuning to or otherwise selecting programming provided by distribution equipment 21 and formatting the programs for recording by remote media server 24. Any suitable combination of analog and digital tuners and decoders are hereinafter referred to as tuners to simplify the discussion. Recorder 125 may direct the one or more tuners to particular channels (analog or digital) at particular times based on entries in job queue 120. In this example, recorder 125 may direct a first tuner to tune to channel 4 on Dec. 21, 1999 to record PROGRAM 1 for user 1. Recorder 125 may also direct a second tuner to tune to channel 5 at the same time to record PROGRAM 2 for user 1 and user 2. The upper limit on the number of tuners needed for remote media server 24 may be the number of channels distributed by distribution equipment 21. Such tuners may be based on tuning and decoding circuitry implemented using one or more integrated circuits.

79

McKool Smith, P.C.

'948 Patent at 11:26-47.

## **Historical Context of the '948 Patent**

294.  Over the years, cable, satellite, and broadcast television providers have offered an increasingly large number of television channels and television program listings, and interactive program guide technology has developed to allow television viewers to more quickly navigate to and select television programs, both currently airing and in the future. '948 Patent at 1:24-35.

295.  Some systems allowed for programs selected with a STB to be recorded and stored with a connected videocassette recorder. While the use of a VCR provided the benefits of basic recording, the functionality was very limited in a number of ways. '948 Patent at 1:41-65.

296.  Systems that used hard disk technology to store programs were available, but these systems suffered from the need for additional hardware to provide functionality throughout a user's home, significantly increasing the cost of the user's home television equipment. '948 Patent at 1:66-2:10.

297.  Video-on-demand (VOD) systems were also available, but these systems fell short in that they either required vast amounts of storage at the server to ensure that all possible videos desired by users will be available, or these systems fell short in that users were limited to only a subset of programs that the operator decided to record. '948 Patent at 2:19-26.

298.  The inventors of the '948 Patent disclosed novel systems and methods to enable a media server to record multiple programs simultaneously in response to different record requests from different user equipment associated with respective users. These novel systems and methods allow multiple subscribers to choose particular content to be recorded on a media server, which expands and tailors the content available to the subscribers on demand while also consolidating program storage.

McKool Smith, P.C.

McKool Smith, P.C.

### '948 Patent Allegations

299.  On information and belief after reasonable investigation, Comcast markets the infringing functionality as "X1 Cloud DVR".[50] On information and belief and after reasonable investigation, Comcast provides the X1 system (the '948 Accused Products), which includes user equipment that allows users to schedule X1 Cloud DVR recordings and X1 Cloud DVR servers that record multiple programs simultaneously for multiple users in response to receiving record requests. Further, on information and belief and after reasonable investigation, Comcast performs the methods claimed in the '948 Patent by receiving record requests from different X1 user equipment associated with different users and simultaneously recording programs at a server.

300.  Comcast has infringed and is infringing, individually and/or jointly, either literally or under the doctrine of equivalents, at least claims 1-3, 5-13, 15-21, 23, and 25-26 of the '948 Patent in violation of 35 U.S.C. §§ 271, *et seq.*, directly and/or indirectly, by making, using, offering for sale, selling, offering for lease, leasing in the United States, and/or importing into the United States without authority or license, set-top boxes, including without limitation, one or more of the '948 Accused Products and associated software (including at least the Xfinity branded IPG) that are used to infringe the '948 Patent. Upon information and belief after reasonable investigation, each of the '948 Accused Products are designed to be and are used with each other and Comcast's servers to receive multiple record requests from user equipment and simultaneously recording multiple programs with a server.

301.  Comcast is an active inducer of infringement of one or more claims of the '948 Patent under 35 U.S.C. § 271(b). Upon information and belief, one or more

---

[50]   *X1 Cloud DVR FAQs*, Xfinity, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Dec. 7, 2018).

of the '948 Accused Products of Comcast directly and/or indirectly infringe (by induced infringement) at least claims 1-3, 5-13, 15-21, 23, and 25-26 of the '948 Patent, literally and/or under the doctrine of equivalents.

302.  This Complaint will serve as notice to Comcast of the '948 Patent and its infringement should Comcast contend that it did not previously have knowledge thereof.

303.  Comcast intentionally encourages and aids at least service providers and end-user subscribers to directly infringe the '948 Patent.

304.  Comcast provides the '948 Accused Products and instructions to Xfinity subscribers so that such subscribers will use the '948 Accused Products in a directly infringing manner. Comcast markets the X1 System to subscribers by touting the X1 Cloud DVR with "60 hours of Cloud DVR storage available for each X1 DVR TV Box on your account."[51] Comcast provides instructions to its subscribers on how to use the functionality of the '948 Patent on these websites as well. Comcast further instructs its subscribers how to watch Cloud DVR recordings.[52]

305.  Comcast subscribers directly infringe by using the '948 Accused Products in their intended manner. Comcast induces such infringement by providing the '948 Accused Products and instructions to enable and facilitate infringement. Upon information and belief, Comcast specifically intends that its actions will result in infringement of the '948 Patent or has taken deliberate actions to avoid learning of infringement.

---

[51]   *X1 Cloud DVR FAQs*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-cloud-technology-general-faqs (last visited Dec. 7, 2018); *see also X1 Cloud DVR Overview*, XFINITY, https://www.xfinity.com/support/articles/x1-dvr-with-cloud-technology-available-features (last visited Dec. 7, 2018).

[52]   *Id.*

McKOOL SMITH, P.C.

306.  Additional allegations regarding Comcast's knowledge of the '948 Patent may have evidentiary support after a reasonable opportunity for discovery.

307.  Comcast's infringement of the '948 Patent is exceptional and entitles Rovi to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

308.  Rovi has been damaged by Comcast's infringement of the '948 Patent and will continue to be damaged unless Comcast is enjoined by this Court. Rovi has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors Rovi, and public interest is not disserved by an injunction.

309.  Rovi is entitled to recover from Comcast all damages that Rovi has sustained as a result of Comcast's infringement of the '948 Patent, including without limitation, lost profits and not less than a reasonable royalty.

## PRAYER FOR RELIEF

WHEREFORE, Rovi prays for a judgment in its favor and against Comcast and respectfully requests the following relief:

1.      A judgment declaring that Comcast has infringed one or more claims of each of the Asserted Patents in this litigation pursuant to 35 U.S.C. §§ 271(a) and/or 271(b);

2.      A preliminary injunction pursuant to 35 U.S.C. § 283 in accordance with the principles of equity preventing Comcast, its officers, directors, attorneys, agents, servants, employees, parties in privity with, and all persons in active concert or participation with any of the foregoing, from continued leasing or offering for lease the X1 IPG Product to any cable operator or any Pay-TV provider that is not licensed by Rovi to make use, license, or sell any product offered by Comcast that practices,

McKool Smith, P.C.

83

provides, or contains any method, apparatus, or system covered by one or more of the Asserted Patents;

3.      A preliminary injunction pursuant to 35 U.S.C. § 283 in accordance with the principles of equity preventing Comcast, its officers, directors, attorneys, agents, servants, employees, parties in privity with, and all persons in active concert or participation with any of the foregoing, from leasing, offering or providing to any of its cable customers and consumer end subscribers any IPG product solution that practices, provides, or contains any method, apparatus, or system covered by one or more of the Asserted Patents commencing on a date ninety (90) days following the entry of the preliminary injunction;

4.      An injunction pursuant to 35 U.S.C. § 283 permanently enjoining Comcast, its officers, directors, attorneys, agents, servants, employees, parties in privity with, and all persons in active concert or participation with, any of the foregoing, from continued acts of infringement, contributing to infringement, or inducing infringement of the Asserted Patents in this litigation;

5.      A judgment requiring Comcast to make an accounting of damages resulting from Comcast's infringement of the Asserted Patents in this litigation;

6.      A judgment awarding Rovi its damages resulting from Comcast's infringement of the Asserted Patents in this litigation, and increasing such damages pursuant to 35 U.S.C. § 284 because of the willful and deliberate nature of Comcast's conduct;

7.      A judgment requiring Comcast to pay Rovi costs, expenses, and pre-judgment and post-judgment interest for Comcast's infringement of each of the Asserted Patents in this litigation;

8.      A judgment finding that this is an exceptional case and awarding Rovi's attorneys' fees pursuant to 35 U.S.C. § 285; and

9.      Such other relief as the Court deems just and proper.

84

McKool Smith, P.C.

DATED: March 6, 2019                    Respectfully submitted,

                                        MCKOOL SMITH, P.C.
                                        */s/ Roderick G. Dorman*
                                        Roderick G. Dorman (SBN 96908)
                                        rdorman@mckoolsmith.com
                                        300 S. Grand Avenue, Suite 2900
                                        Los Angeles, California 90071
                                        (213) 694-1200 / (213) 694-1234 (fax)

                                        Douglas A. Cawley (*pro hac vice*)
                                        dcawley@mckoolsmith.com
                                        300 Crescent Court, Suite 1500
                                        Dallas, Texas 75201
                                        (214) 978-4000 / (214) 978-4044 (fax)

                                        Joshua W. Budwin (*pro hac vice*)
                                        jbudwin@mckoolsmith.com
                                        John B. Campbell (*pro hac vice*)
                                        jcampbell@mckoolsmith.com
                                        Kristina S. Baehr (*pro hac vice*)
                                        kbaehr@mckoolsmith.com
                                        R. Mitch Verboncoeur *(pro hac vice)*
                                        mverboncoeur@mckoolsmith.com
                                        300 W. 6th Street, Suite 1700
                                        Austin, Texas 78701
                                        (512) 692-8700 / (512) 692-8744 (fax)
                                        *Attorneys for Plaintiff*

85

COMPLAINT FOR PATENT INFRINGEMENT

## **DEMAND FOR JURY TRIAL**

In accordance with Rule 38 of the Federal Rules of Civil Procedure and Local Rule CV-38-1, Plaintiff respectfully demands a jury trial of all issues triable to a jury.


DATED: March 6, 2019                    Respectfully submitted,

MCKOOL SMITH, P.C.

BY */s/ Roderick G. Dorman*

RODERICK G. DORMAN

ATTORNEYS FOR PLAINTIFF
ROVI GUIDES, INC.

COMPLAINT FOR PATENT INFRINGEMENT